(R.D. 11290)

MANTELL EXPORT CO. v. UNITED STATES

Entry No. 956758, etc.

(Decided April 12, 1967)

*Barnes, Richardson & Colburn* (*Norman C. Schwartz* and *Rufus E. Jarman, Jr.*, of counsel) for the plaintiff.

*Barefoot Sanders*, Assistant Attorney General (*Richard J. Kaplan* and *Arthur H. Steinberg*, trial attorneys), for the defendant.

RAO, Chief Judge: The appeals for reappraisement herein involved, which have been consolidated for purposes of trial, are concerned with the value of certain wooden coathangers exported from Yugoslavia during the months of December 1963 through February 1964 and entered at the port of New York. The issues in this case were framed by the parties in an oral stipulation which sets forth the following agreed facts:

First, that the involved merchandise consists of wooden coathangers of the wishbone type exported from Yugoslavia in December of 1963 and January and February of 1964 by the firm of Slovenijales Kooperativa of Ljubljana, Yugoslavia.

Second, that the merchandise was entered for consumption after the effective date of the Customs Simplification Act of 1956 published in T.D. 54165, and is not identified on the final list published by the Secretary of the Treasury pursuant thereto, T.D. 54521.

Third, that on or about the dates of exportation of the involved merchandise, the seller, Slovenijales Kooperativa, did not sell such merchandise to all purchasers for export to the United States.

Fourth, that the basis of appraisement was the export value, as defined in section 402(b) of the Tariff Act of 1930, as amended of such merchandise as that term is defined in section 402(f)(4) of the Tariff Act of 1930, as amended.

Fifth, that the issues herein are limited to whether the hangers identified on the invoices before the court with the suffix X were of a

different quality than those hangers not so identified, and if so, what is the correct dutiable value for such hangers so identified.

Plaintiff concedes the correctness of the appraisement on all other hangers on the invoices.

Sixth, that the principal market is at the sales office of Slovenijales Kooperativa in Ljubljana, Yugoslavia; that the usual wholesale quantity is 1,000 pieces; that the invoice unit prices include the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition packed ready for shipment to the United States.

The pertinent data concerning the items in dispute, which were imported packed in cartons of 100 pieces, is as follows:

| Reap. No. | Item No. | Quantity of cartons | Carton Nos. | Claimed value invoiced & entered prices (per 1000 pieces) less ocean freight & insurance | Appraised value (per 1000 pieces) less ocean freight & insurance |
|---|---|---|---|---|---|
| R64/12834 | W55/17″SHX | 1017 | 4603–5619 | $95.50 | $115.50 |
| R64/12835 | W55/14″SHX | 29 | 159–187 | 95.50 | 115.50 |
| | W55/17″SHX | 800 | 5620–6419 | 95.50 | 115.50 |
| | W56/17″SHX RED | 19 | 1–19 | 95.50 | 142.50 |
| | W56/17″SHX MAPLE | 50 | 31–80 | 95.50 | 142.50 |
| | W55/16″SHX | 578 | 963–1540 | 95.50 | 115.50 |
| | W56/17″SHX BLACK | 117 | 49–165 | 95.50 | 142.50 |
| R64/12836 | W55/16″SHX | 446 | 1541–1986 | 95.50 | 115.50 |
| | W56/17″SHX BLACK | 42 | 166–207 | 95.50 | 142.50 |
| | W55/17″SHX | 434 | 6420–6853 | 95.50 | 115.50 |
| R64/12838 | W56/17″RHX GOLD | 10 | 54–63 | 95.50 | 115.50 |
| | SHX GOLD | 6 | 64–69 | | |
| | W55/16″SHX | 26 | 937–962 | 95.50 | 115.50 |
| | W55/17″SHIBX | 10 | 1–10 | 95.50 | 115.50 |
| R64/12688 | W55/17″SHX | 50 | 6854–6903 | 95.50 | 115.50 |

The pertinent statutory definitions read as follows:

Section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, *supra:*

(b) EXPORT VALUE.—For the purposes of this section, the export value of imported merchandise shall be the price at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Section 402(f) of said act, as amended, *supra:*

(f) DEFINITIONS.—For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A)   to all purchasers at wholesale, or

(B)   in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

(2)   The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

It appears from the record and the evidence submitted on behalf of the plaintiff that, commencing in October 1961, plaintiff entered into an agreement with Slovenijales Kooperativa acting on behalf of the producer, KLI Logatec, for the exclusive purchase of wishbone-type clothes hangers for export to the United States, which agreement was renegotiated annually for the ensuing 3 years. Plaintiff's exhibits 1 to 4 are copies of the agreements in question. By the terms of the agreement, current at the time of the importations here involved, the seller contracted to supply a minimum of 400,000 complete wishbone hangers each month, which could include "any number of second quality hangers which are normally produced." First quality specifications called for hangers of "clean Beechwood, free of splits, knots and/or stronger discoloration, smoothly sanded and properly waxed or laquered [sic]. The moisture contents of wood must not exceed 12%. The hooks and wires to be bright plated, of good quality, without any rusting or tarnishing." Second quality hangers were allowed to have "stronger discoloration of wood, smaller sound knots or blemishes, but they have to be smooth. Wire has to be the same as on the first quality hangers." The contract price for all unlacquered X quality hangers was $95.50 per thousand.

Otto Basil Mantell, the sole owner of plaintiff company, testified in its behalf. He defined a first quality hanger as one made from unblemished white wood, without any discolorations, knots, or imperfections and with perfectly formed smooth joints as illustrated by plaintiff's exhibit 5.

Typical conditions which might downgrade a hanger to second quality, in the opinion of this witness, are discolorations and notches in the wood, as illustrated by plaintiff's exhibit 6; improperly fashioned joints, such as appear on plaintiff's exhibit 8; roughness in the

dowel or splits in the wood of the kind found in plaintiff's exhibit 9; and the imperfections and strong discolorations typified by plaintiff's exhibit 10. Dark discoloration and chips in the wood which might tend to damage the fabric of a garment such as appear in plaintiff's exhibit 7 would not be acceptable even in a second quality hanger.

According to the witness, there is no relation of any kind between the plaintiff, its officers and directors, and any of the three Yugoslavian concerns mentioned in the contract. The prices are arrived at in free bargaining and are the highest plaintiff is willing to pay. The price for second quality hangers is $95.50 per 1,000, c.i.f., New York, under the terms of the contract received in evidence as plaintiff's exhibit 4, and said price has been lower than that of first quality hangers during all the years that the witness has been importing hangers.

Mr. Mantell testified that a second quality hanger would serve the same purposes as a first quality hanger but would not be as "esthetic." A carton of 100 hangers would be considered first quality even if it contained some second quality hangers, so long as they were not present in an amount greater than approximately 10 percent. The percentage of lightly discolored hangers permissible in a carton of first quality is not specified in the contract but is rather in the nature of a trade understanding. The witness prefers to deal in first quality hangers only but has been accepting second quality in 20 to 25 percent of his importations.

In a carton of second quality hangers, 50 percent would have light discoloration while the other 50 percent would have either heavy discoloration, improperly filled knots, or imperfections in the joints. None of the aforementioned imperfections, said the witness, can be of such a nature as to damage clothing. Occasionally, some first quality hangers will be found in a carton of second quality hangers. The responsibility for sorting the hangers rests on the shipper and, according to the witness, has "by and large" been done in an equitable manner.

The witness indicated that the merchandise in issue was sent to plaintiff's customer directly from the pier and that the witness did not inspect the hangers. Plaintiff introduced in evidence as plaintiff's exhibits 11 to 15 certain invoices reflecting the resale in the United States of some of the hangers covered by appeals for reappraisement R64/12688, R64/12834, R64/12838, and R64/12836. In keeping with the asserted method of indicating the second quality hangers, such hangers are marked X on the sales invoices. It also appears that the X quality hangers are resold at lower prices than the remainder of the shipment.

As regards lacquered hangers, the witness testified that they would usually be considered as second quality if they had chipped paint. Discoloration would not normally interfere with their value inasmuch as the coating of lacquer would cover such an imperfection.

Plaintiff's second witness was Mr. Janez Jese, associated with United Trade Representatives, a body which promotes the export of Yugoslavian manufactures to the United States. Mr. Jese's familiarity with woodenware dates from 1953 when he joined Slovenijales Kooperativa in Yugoslavia. He worked on the export of woodenware including coathangers, which he inspected in the factories and, after his 1960 arrival in the United States, at warehouses here. He was involved in the negotiations between Mantell and Slovenijales Kooperativa, drafted the contracts of 1961, 1962, and 1963 and the letter introduced in evidence as plaintiff's exhibit 16, which expressed the understanding that Mantell would accept the normal percentage of second quality hangers exported by Slovenijales Kooperativa.

Mr. Jese explained that KLI is a factory located at Logatec while Slovenijales Kooperativa is an exporting firm which handles the output of over 50 Yugoslavian wood product manufacturers. It is the only Yugoslavian seller of wishbone hangers to the United States. It also accounts for about 80 percent of the sale of wooden hangers and 50 percent of other wooden items.

Mr. Jese testified at length as to the distinctions between first and second quality hangers. According to him, a first quality hanger of the wishbone type must be clean, made of clean wood, without any discoloration or blemish, possessing perfect shape and smoothness. The second quality hangers may have wood defects such as discoloration, knots, splits, or manufacturing defects such as imperfect joints, insufficient sanding, and misshapeness. The witness mentioned that a marked increase in second quality hangers, commencing in October of 1963, was due to the bad quality of lumber resulting from poor weather conditions in the timberland of Yugoslavia.

The witness testified that the presence of 10 to 20 percent of lightly discolored or second quality hangers in a carton of first quality was tolerated in the dealings between the parties. In a carton of second quality hangers, 50 percent would usually be lightly discolored (similar to those permitted to comprise 10 to 20 percent of the first quality cartons) and 50 percent would possess stronger discoloration, imperfect joints, roughness, and knots. There is also a possibility, according to the witness, that some first quality hangers will be found in a carton of second quality hangers.

Mr. Jese also testified with regard to the price differential between first and second quality hangers. He stated that the instant differential was approximately the same in terms of percentage as that which prevailed in sales conducted by him to other United States purchasers prior to the time when Mantell became the exclusive United States purchaser from Slovenijales Kooperativa. The differential

was also approximately the same as that existing in sales by Slovenijales Kooperativa to third countries and in its home market. The witness stated that the price arrived at between Slovenijales Kooperativa and Mantell was the lowest which Slovenijales Kooperativa would accept and the highest which Mantell would pay and, in light of his previously mentioned familiarity with the sale of different grades of hangers, such price fairly reflected the market value of second quality hangers.

Plaintiff introduced in evidence as exhibit 17 the affidavit of Dr. Saša Reicher, export manager of Slovenijales Kooperativa. Dr. Reicher averred that the prices in all agreements between Slovenijales Kooperativa and Mantell were arrived at by free negotiations, were the highest prices acceptable to Mantell and the lowest prices acceptable to Slovenijales Kooperativa, and that no relationship existed between the two firms other than that of buyer and seller.

Deponent further stated that cartons of first quality hangers could contain 10 to 20 percent of lightly discolored hangers while cartons of second quality hangers ordinarily contained 50 percent with light discoloration and the remainder with stronger discoloration and other defects. The same quality grading and price differential is recognized in Yugoslavia and the other countries to which Slovenijales Kooperativa sells.

The first witness for the defendant was Mr. Max Eisen, who has been the examiner of hangers at the port of New York since 1953, during which time he has passed upon entries involving about 10 million hangers per year. Mr. Eisen testified that he examined the involved shipments and treated the hangers in the following manner:

As regards entry 934587, covered by appeal for reappraisement R64/12838, Mr. Eisen examined all hangers in cartons No. 7770 and No. 6 and chose two hangers at random from each carton which he considered representative of all the hangers therein. These were introduced in evidence, respectively, as defendant's exhibits A-1, A-2, B-1, and B-2.

As regards entry 932497, covered by appeal for reappraisement R64/12834, Mr. Eisen examined all hangers in cartons No. 4867, 5566, 5587, and 5297 and chose two hangers at random from Nos. 5566 and 4867 which he considered representative of all the hangers therein. These were introduced in evidence, respectively, as defendant's exhibits C-1, C-2, D-1, and D-2.

As regards entry 929625, covered by appeal for reappraisement R64/12835, Mr. Eisen examined all hangers in cartons No. 8059, 8748, 8038, 6217, and 6215 and chose two hangers at random from Nos. 6217 and 6215 which he considered representative of all the hangers therein. These were introduced in evidence, respectively, as defendant's exhibits E-1, E-2, F-1, and F-2.

As regards entry 944751, covered by appeal for reappraisement R64/12836, Mr. Eisen examined all hangers in cartons No. 6690 and 6722 and chose two hangers at random from each carton which he considered representative of all the hangers therein. These were introduced in evidence, respectively, as defendant's exhibits G-1, G-2, H-1, and H-2.

As regards entry 956758, covered by appeal for reappraisement R64/12688, three representative samples were selected by the customs sampler at the pier from cartons No. 6854 to 6903 and sent to Mr. Eisen. These were introduced in evidence at defendant's exhibit I-1, I-2, and I-3.

Mr. Eisen testified that he considered the hangers represented by defendant's exhibits A through I to be first quality hangers due to the absence of large knots and ragged edges which might tear the linings of clothing. The witness stated that the invoices and the contract dated October 28, 1963, did not list the hangers as second quality but rather designated them with the symbol "X" and listed them at a price which was 2 cents per hanger cheaper than first quality. He assumed only that, between the buyer and seller, these are second quality. To him they are only hangers which are invoiced at $20 per 1,000 less than others.

It was stipulated by the parties that the appraiser of merchandise at the port of New York adopted the findings and advisory recommendations which Examiner Eisen made with regard to all entries of wishbone-type hangers made before and after 1963.

Defendant's second witness was Mr. Leon Levin, president of the Acme Hanger Co., who had purchased, sold, and manufactured wooden coathangers since 1930 and was familiar with the grading of hangers in the American market. Mr. Levin stated that he manufactured only first quality wishbone-type hangers but, through dealings in importations, was familiar with second quality hangers. Prior to 1961, he had purchased what he considered to be first quality wishbone hangers, comparable to defendant's exhibits A through F, and other types of hangers from Slovenijales Kooperativa.

In Mr. Levin's opinion, defendant's exhibits A through F appear to be first quality hangers. According to Mr. Levin, a hanger is first quality if it is smoothly milled, waxed, polished, has smooth joints, no knots, no rusty wire, and is of uniform quality. He did not consider a natural stain in the wood to be a discoloration nor would he call the joint in exhibit D-2 a rough joint although it is less perfect than that of D-1. It would not catch the clothing and could be hidden by a label.

Mr. Jese was called in rebuttal to express his views concerning the hangers extracted by the examiner from the shipments in question and

stated to be the merchandise at issue. His reaction to these exhibits may be charted as follows:

| Exhibit No. | Mr. Jese's opinion as to quality | Reasons |
|---|---|---|
| A–1 | Second | Discoloration on bar and right shoulder |
| A–2 | First | |
| B–1 | Second | Knot on dowel, imperfect joint, discoloration on left shoulder |
| B–2 | Second | Imperfect joint, discoloration of right shoulder and bar |
| C–1 | First | |
| C–2 | Second | Bent dowel |
| D–1 | First | |
| D–2 | Second | Bad joint, discoloration on right shoulder |
| E–1 | Second | Bad lumber on right shoulder |
| E–2 | Second | Discoloration on shoulders |
| F–1 | Second | Imperfect joint, slight discoloration of left shoulder, malfunctioning dowel |
| F–2 | Second | Discoloration both in the shoulders and on the dowel |
| G–1 | First | |
| G–2 | Second | Knot on right shoulder, slight discoloration |
| H–1 | Second | Knot on left shoulder, slight discoloration |
| H–2 | Second | Imperfect joint, discolored bar |
| I–1 | Second | Discoloration |
| I–2 | Second | Discoloration |
| I–3 | Second | Knot on right shoulder |

Plaintiff introduced in evidence as exhibit 18, a notice of a dumping complaint, dated August 30, 1963, against wooden hangers from Yugoslavia and, as exhibit 19, a notice dated March 26, 1964, of exoneration of such charges on the grounds that this merchandise was not being sold to the United States at less than fair market value within the meaning of the Antidumping Act of 1921. Mr. Eisen testified that the merchandise involved in the dumping dispute consisted of both first and second quality hangers and that Slovenijales Kooperativa was the firm mentioned as selling more than 90 percent of the wooden

coathangers imported into the United States in the fair market determination in the Federal Register of March 4, 1964, at page 2952.

As heretofore noted, the parties have stipulated that the issues herein are limited to "whether the hangers identified on the invoices before the court with the suffix X were of a different quality than those hangers not so identified and if so, what is the correct dutiable value for such hangers identified with the suffix X." In effect, this dispute centers on whether the hangers in issue are second quality as claimed by plaintiff, or first quality as indicated by the appraisement.

As a preliminary to the determination of whether the hangers in issue are first or second quality, it is first essential to consider what standards should be applied to mark the distinction between the two grades, since it appears that the parties are at odds over the attributes governing each category. According to the witnesses for the plaintiff, first quality hangers are hangers without any imperfections, while second quality hangers, although fit for use, possess some imperfections such as discoloration, roughness, and uneven joints. To illustrate the distinctions drawn by its witnesses, plaintiff introduced several hangers into evidence, none of which, however, was shown to be representative of the condition of the hangers in issue.

The testimony of the defendant's witnesses, on the other hand, tends to indicate that second quality hangers would be those which are considerably more malformed than described by plaintiff's witnesses, and would possess substantial defects such as ragged edges, which in effect inhibit their use for hanging clothing.

The court's analysis of these contrasting positions inclines it to the view that plaintiff's standards for differentiating between first and second quality hangers are the more realistic. They are set forth plainly by witnesses with extensive experience in the trade and long familiarity with the instant importations. They are in consonance with the contractual dealings between the parties, which, while not conclusive, lend them a certain credibility. Moreover, it seems more reasonable to assume that hangers need not contain drastic imperfections to be designated second quality, than to conclude, as defendant's testimony would tend to establish, that a second quality hanger is virtually the same as a useless hanger. The weight of the evidence supports the view that the presence of discoloration, roughness, or unsmooth joints constitutes a sufficient basis for considering wishbone hangers to be of inferior or second quality.

It remains to be seen whether the evidence suffices to support a finding that hangers invoiced as X quality were in fact second quality within the standards thus established. Insofar as plaintiff's case in chief was concerned, its evidence was largely in the abstract, unrelated

to the hangers in issue, except to the extent of implying that the hangers marked with the suffix X on the invoices here involved were second quality under the terms of the contract between plaintiff and Slovenijales Kooperativa. In fact the initial testimony of plaintiff's witnesses, standing alone, does not show that any portion of the imported merchandise conformed to the standards of second quality which that same testimony succeeded in establishing.

However, the omissions of plaintiff's proof seem to have been supplied, in part at least, by the evidence adduced by the defendant. An extensive sampling of the hangers in dispute was moved into evidence by defendant, upon a basis which established that the hangers, which were selected at random by the examiner, were representative of the hangers marked X on the invoices before the court. These representative samples, which are themselves potent witnesses, were the subject of critical examination by the witness Jese, with the conclusions hereinabove outlined.

Although the examiner considered these hangers to be first quality, he formed his opinion as the result of standards which have here been held to provide an inadequate basis for distinguishing second quality from first.

Applying those criteria considered as acceptable indications of second or X quality standards to admittedly representative samples, fortified by the witness Jese's comments upon the same, the court is inclined to the view that they are indeed second class. They possess defects of the kind recounted in the summary of the testimony and are, therefore, to be excluded from the category of first quality hangers. The condition of the samples, together with the indicia specified in the contract and the course of dealing between the parties and in the trade, is persuasive that the disputed hangers of the type introduced in evidence by the defendant are of second quality.

These observations cannot, however, relate to the lacquered hangers concerning which mention was made in the record, since no samples thereof were introduced into evidence, nor other proof made that the lacquered hangers included in the instant shipments were second quality. There are standards to be applied, but no representative articles which can be examined in the light of such standards to determine conformity therewith. Accordingly, the court is constrained to hold that with respect to X quality lacquered hangers, those identified in the record as invoiced items W56/17″ SHX Red, W56/17″ SHX Maple, W56/17″ SHX Black, W56/17″ RHX Gold, W56/17″ SHX Gold, there is no evidence to disturb the presumptively correct finding of the appraiser.

The determination that X quality hangers, other than X quality lacquered hangers, are second quality raises the question of whether the record suffices to establish that the invoice price represents export

value as that value is defined in section 402(b) of the Tariff Act of 1930.

The parties have stipulated that the principal market for the sale of such hangers in the country of exportation is the sales office of Slovenijales Kooperativa in Ljubljana, Yugoslavia; that the usual wholesale quantity is 1,000 pieces and that the invoice unit prices include the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition packed or ready for shipment to the United States. The record shows that Mantell makes its purchases in the stipulated wholesale quantity of 1,000 pieces or more and no restrictions are imposed on the use or disposition of the merchandise.

In this context, the issue revolves around whether the instant sales, to a party clearly recognizable as a "selected purchaser," were made in the ordinary course of trade and at a price which fairly reflected the market value of the merchandise.

The weight of the evidence supports the conclusion that plaintiff has successfully shown that the invoice prices of the instant hangers correctly represent the export value. As regards the question of whether these sales are in the ordinary course of trade, it has been determined by the Court of Customs and Patent Appeals that, when the business of the exporter and importer represents a substantial portion of the industry's sales of merchandise of the type in dispute and such business relations have been in effect for some time, the course of business may properly be considered as being within the ordinary course of trade. *Chr. Bjelland & Co., Inc.* v. *United States*, 52 CCPA 38, C.A.D. 855. The testimony indicates that the exporter in this case was responsible for at least 80 percent of the Yugoslavian coathangers exported to the United States and for 100 percent of the wishbone type. This fact, together with the knowledge that a continuous course of dealing existed on similar terms between the parties since October 1961 and that such course of dealing with regard to quality standards and price differentials was similar to that between Slovenijales Kooperativa and purchasers in its home market and other countries, suggests that the business dealings herein were normal in the trade under consideration with respect to such merchandise. Accordingly, the court finds that the manner of doing business here is within the ordinary course of trade.

The court further finds that the invoice prices for second quality hangers, other than lacquered hangers, fairly reflect their market value as is called for by the section 402(f)(1)(b). There are a number of factors established by plaintiff's evidence which support this conclusion. The prices were arrived at by negotiation at arm's length between independent and unrelated parties. The negotiations took place under normal market conditions, and the prices agreed upon were the

highest the buyer was willing to pay and the lowest the seller would accept. Proof of such uncoerced negotiations leading to a sale is some evidence that the price arrived at fairly represented market value.[1] Market value was defined by the third division of this court in *United States* v. *Alfred Kohlberg*, 2 Cust. Ct. 849, Reap. Dec. 4526, affirmed *Same* v. *Same*, 27 CCPA 223, C.A.D. 88, as follows:

Market value has been defined as the price at which the manufacturer holds his merchandise for sale, the price at which he freely offers it in the market, and the price which he is willing to receive, and the purchasers are willing to pay, in the ordinary course of trade. See *United States* v. *Sixteen Cases of Silk Ribbons*, 27 Fed. Cases 1099. * * *

Furthermore, the testimony of plaintiff's witnesses shows that the price differential between first and second quality hangers in the instant sales was approximately the same as existed in sales for home consumption and to other countries. Moreover, the fact that Slovenijales Kooperativa was found not to have been engaged in a violation of the Antidumping Act of 1921, as amended, with regard to shipments of its hangers during 1963, is also persuasive. While this circumstance standing alone could not conclusively determine that sales of all the instant hangers were made at fair market value, it suggests that, during a period when many of the instant hangers were imported, they were not being sold at prices which were less than their fair value, within the contemplation of said antidumping act.

When these various factors are taken into consideration, they tend to show that sales of the subject X quality hangers were made under such circumstances and at such prices as fairly reflect the market value thereof within the meaning of section 402(f)(1)(B) of the Tariff Act of 1930, as amended, *supra*.

In the light of the foregoing considerations, the court makes the following findings of fact:

1. That the merchandise involved in these consolidated appeals for reappraisement consists of wooden coathangers of the wishbone type, identified by the suffix X and exported from Yugoslavia by Slovenijales Kooperativa of Ljubljana in December 1963 and January and February 1964.

2. That the merchandise was entered for consumption after the effective date of the Customs Simplification Act of 1956, 91 Treas. Dec. 295, T.D. 54165, and does not appear on the Final List of the Secretary of the Treasury, T.D. 54521.

3. That the basis of appraisement was export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by said Customs Simplification Act, and such basis of appraisement is not challenged.

---

[1] For the effectiveness of arm's length transactions in tending to prove that a negotiated price is fair and reasonable, see *Eli Lilly & Company* v. *The United States*, U.S. Court of Claims, No. 293–61, decided February 17, 1967, and cases cited therein.

4. That the merchandise was sold to plaintiff as a selected purchaser at wholesale and that such or similar merchandise was not offered by the seller to any other purchaser in the United States.

5. That the principal home market is the sales office of the seller in Ljubljana, Yugoslavia.

6. That the usual wholesale quantity is 1,000 pieces.

7. That the invoice unit prices include the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition packed ready for shipment to the United States.

8. That the appraisement herein is contested as to those hangers identified on the invoices with the suffix "X."

9. That the merchandise so identified, other than such as is established to be lacquered, was of second quality and differed in this respect from the merchandise not so identified.

10. That the sales of such second quality hangers were made in the ordinary course of trade.

11. That the invoice prices for such second quality hangers were negotiated under normal market conditions, at arm's length, and were consistent with similar price differentials from first quality in home market sales and in sales to other countries.

12. That the evidence fails to establish that any of the lacquered hangers included in these importations were of a second quality.

The court, therefore, concludes:

1. That the invoice prices for hangers identified with the suffix "X" other than those established to be lacquered, fairly reflected the market value thereof.

2. That export value, as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, is the proper basis of appraisement for said second quality hangers.

3. That such export value for said hangers is $95.50 per 1,000 pieces, less the prorated share of ocean freight and marine insurance premium, as invoiced.

4. That in all other respects as to all other hangers, the export value is the appraised value.

Judgment will be entered accordingly.