(R.D. 11726)

MANTELL EXPORT COMPANY *v.* UNITED STATES

Entry Nos. 876689, etc.

(Decided November 18, 1970)

*Barnes, Richardson & Colburn* (*David O. Elliott* of counsel) for the plaintiff.
*William D. Ruckelshaus*, Assistant Attorney General (*Bernard J. Babb*, trial attorney, for the defendant.

MALETZ, Judge: The question in these 29 appeals for reappraisement—which have been consolidated for trial—concerns the proper dutiable value of certain wishbone-type (curved) wooden lacquered hangers that were exported from Yugoslavia during a period extending from the latter part of 1963 through early in 1967. The hangers were invoiced and entered at the contract prices for second quality hangers (less ocean freight and insurance), which prices were below those for first quality wooden lacquered hangers that were included in the same shipments.

Appraisement of all the lacquered hangers was made on the basis of export value under section 402(b) of the Tariff Act of 1930, as amended, at the invoice prices for first quality hangers, less ocean freight and insurance. Plaintiff does not dispute the basis of appraisement but claims that the proper export values for the hangers are the invoice prices for second quality hangers, less ocean freight and insurance.[1]

Section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, provides as follows:

(b) Export Value.—For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such

---

[1] Included in the appeals for reappraisement were unlacquered hangers that were identified on the invoices as second quality hangers. These hangers are no longer in controversy, the parties having entered into a stipulation as to their proper dutiable values.

price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Section 402(f) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, reads:

(f) Definitions.—For the purposes of this section—
(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—
(A) to all purchasers at wholesale, or
(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

The parties have stipulated that the lacquered hangers in controversy that were listed on the invoices as second quality hangers were appraised on the basis of export value at so-called first quality prices, less ocean freight and insurance; that the principal market for the merchandise was the sales office of the exporter, Slovenijales, in Ljubljana, Yugoslavia; that the usual wholesale quantity is 1,000 pieces; that sales were made in the ordinary course of trade; that no restrictions were imposed on the disposition or use of the merchandise; that the invoice unit prices included the cost of packing and other expenses incident to placing the merchandise in condition for shipment to the United States; and that the plaintiff-importer, Mantell, is a selected purchaser of the merchandise from Yugoslavia.

In view of this stipulation, the dispute is narrowed to the question of whether or not the invoice prices for the lacquered hangers fairly reflect market value. This, in turn, depends principally on whether the hangers in question are second quality, as claimed by plaintiff, or first quality, as indicated by the appraisement. On this aspect, it is to be observed that the same issue was involved in a prior case—*Mantell Export Co.* v. *United States*, 58 Cust. Ct. 662, R.D. 11290 (1967)—the record in which has been incorporated here. In that case, the court held that plaintiff had failed to prove that the lacquered hangers there involved—which were imported during the period from December 1963 through February 1964—were second quality on the basis that "no samples thereof were introduced into evidence, nor other proof made that the lacquered hangers * * * were second quality." *Id.* at 672. The court added: "There are standards to be applied, but no representa-

tive articles which can be examined in the light of such standards to determine conformity therewith." *Ibid.*

It is against this background that we now summarize the record in the present case. Plaintiff's first witness was a representative of the Yugoslavian exporter, Slovenijales, who was familiar with the latter's sales to plaintiff. His testimony was to the following effect: The hangers sold to plaintiff were curved or wishbone-style hangers made of beechwood; they range in size from 10 to 21 inches and are both lacquered and unlacquered. During the period from 1963 to 1967, Slovenijales was the only Yugoslavian exporter that sold wishbone hangers for export to the United States, and plaintiff was the only company in the United States which imported such hangers from Yugoslavia.

The witness described the production of the lacquered hangers as follows: The beechwood lumber is prepared and then cut into the arm sections of the hanger according to the size desired; the arms are then shaped and glued together at the joint; a selection is then made of first and second quality based upon the quality of the lumber itself; the hangers are then lacquered by being dipped twice into a vat or basin of lacquer; wire hooks are attached and the hangers are then selected again as to first and second quality and packed in cartons of 100 each, smaller sizes up to 150 per carton.

According to the witness, a first quality hanger must be perfect and free from manufacturing defects. A second quality hanger, while salable, will have lumber defects such as knots, which are covered over by lacquer, and/or manufacturing defects such as chipped lacquer, open joints, spots, air bubbles, and any defect in appearance. The witness testified that while the aim is to have 100 percent second quality hangers in a second quality carton (and vice versa for first quality cartons), due to the human element, some hangers which could sell as first quality hangers will show up in second quality cartons. However, when this occurs, the deviation is usually not more than 10 percent so that the vast majority of hangers in a second quality carton should be second quality hangers.

The standards for first and second quality lacquered hangers are also set forth in the 1965 and 1966 sales contracts between the exporter and plaintiff. Thus, under these contracts "first quality hangers are to be made of clean beechwood, free of splits, knots, stronger discoloration and/or manufacturing defects, smoothly sanded and properly * * * lacquered, up to 50% may however contain lighter discoloration." By contract, "[s]econd quality hangers may include * * * lighter or stronger discoloration of wood, smaller sound knots and blemishes and manufacturing defects, all of which may influence the appearance but not the usability of such hangers with regard to the strength and

smoothness of all parts." The sales contracts, in addition, contain price lists for various kinds of hangers, with second quality lacquered hangers identified by the letter "X" and/or the word "seconds." In turn, the typical commercial invoice identifies second quality lacquered hangers in the same manner.

The witness stated that lacquered hangers require more production work than unlacquered hangers because of the lacquering process. Nevertheless, he added, the price for both second quality unlacquered and lacquered hangers was the same for 1965 and 1966 but increased proportionately for second quality lacquered hangers in 1967 because of the seller's decision to reflect the increasingly higher labor costs incurred in producing lacquered hangers.

The witness further testified that Slovenijales does not sell wishbone-type hangers in the home market, Yugoslavia, but rather sells other types of wooden hangers there and in third countries; that the latter are sold at both first and second quality prices; that the percentage spread between prices for first quality and second quality hangers ranged between 20 and 25 percent, depending upon the purchaser's buying position and the production calculations of the manufacturers; and that percentage-wise the price spread is approximately the same as on sales to plaintiff. He also stated that there is no corporate, financial or blood relationship existing between Slovenijales and plaintiff, and that they deal solely as buyer and seller, with the prices Slovenijales receives being the lowest it will accept.

Finally, 12 hangers—plaintiff's collective illustrative exhibit 4—were received in evidence as representative of merchandise invoiced as second quality lacquered hangers.[2] The witness, subsequent to examining them, testified that they were of second quality for the following reasons: exhibit 4a—a lacquer defect and a split beginning in the joint; exhibit 4b—air bubbles in the lacquer coating; exhibit 4c—a defect in the lacquer and a nail split; exhibit 4d—open joint; exhibit 4e—open joint and scratched; exhibits 4f, g and h—open joints; exhibit 4i—split in joint; exhibit 4j—lacquer defect in dowel; and exhibits 4k and l—open joints.

Plaintiff's second witness, the president of plaintiff company, testified that he had been importing coat hangers from Slovenijales for the past 11 or 12 years. He identified the contracts he entered into with Slovenijales covering importations of coat hangers for the years 1965 and 1966, and further identified the second quality lacquered hangers listed in those contracts as being described by the letter "X" or the words "seconds." He stated that he heard and agreed with the

---

[2] The remainder of the carton of merchandise invoiced as second quality lacquered hangers—which consists of 88 hangers—was received in evidence as plaintiff's illustrative exhibit 5. In addition, a carton of 100 lacquered hangers—plaintiff's illustrative exhibit 6—was received in evidence as a representative carton of first quality lacquered hangers.

previous witness' testimony concerning the criteria used in selecting second quality lacquered hangers, and that such factors or criteria had remained the same in all his dealings with Slovenijales since 1963.

The witness said that there is no blood, corporate or financial relationship between plaintiff and Slovenijales; that the transactions were at arm's length; and that the contract prices were the highest he was willing to pay. He explained that he sold the imported hangers to jobbers at two different price levels, one for first quality and the other for second quality, with the price for first quality being $200.00 per thousand, and the price for second quality, $150.00 per thousand. The jobbers, in turn, sell the hangers to clothing manufacturers who mount clothes on them and ship them to retail stores. He testified that first and second quality hangers serve the same function. However, he stated that second quality hangers are usually purchased by manufacturers of very cheap garments who do not mind using hangers of second quality to hang their garments. Finally the witness testified that the cartons in which the hangers are imported and sold by him are distinctively marked by letters and numbers to indicate the color and quality.

Defendant presented as a witness a person who has been president of a domestic hanger manufacturing company since 1930. He testified that his company manufactures natural wood and plastic hangers for sale to garment manufacturers and to retail stores; that sales are made all over the United States and production runs over 2,000,000 hangers a year; that in the 1940's he had manufactured wooden lacquered hangers but had not manufactured them since 1947; and that, based upon his experience, he was familiar with the term "second quality hangers." Referring to wooden lacquered hangers, he stated that, again based upon his experience, a second quality hanger is primarily one that has a manufacturing defect would cause the lining of a garment to snag or catch, but it could also be one with an unsound knot or a burr on the wire.

The witness examined each of the 12 hangers comprising plaintiff's exhibit 4 and stated that they were first quality hangers because in each instance the hook turns, the trouser bar opens up, and the general overall appearance displayed nothing that would catch or snag a garment.[3] Based upon the same criteria, he characterized plaintiff's exhibits 5 and 6 as first quality hangers.

On cross-examination, he testified that in the 1940's when he manufactured wooden lacquered hangers, all such domestically produced hangers were of first quality; that presently only one United States company makes wishbone lacquered hangers; that this company

---

[3] On second thought the witness felt that exhibit 4b possibly would be a second because of the presence of eight or ten air bubbles in the lacquer.

manufactures only one grade; that he does not know whether hangers made in other countries are sold in two qualities or grades in this country; and that he has never purchased lacquered or unlacquered hangers from Slovenijales.

Turning now to the legal aspects, the dispute, as we have seen, has been narrowed to the question of whether or not the invoice prices for the merchandise fairly reflect the market value. For the reasons that follow, it must be concluded that the answer be in the affirmative. For one thing, the record establishes that the prices for the hangers were negotiated at arm's length each year by the parties and set forth in written agreements containing also the quantities and qualities of the merchandise so sold. The parties were independent and unrelated to each other, and acted solely as buyer and seller of the merchandise, with the seller trying for the highest price it could obtain and the buyer, the lowest it would pay. "Proof of such uncoerced negotiations leading to a sale is some evidence that the price arrived at fairly represented market value." *Mantell Export Co.* v. *United States, supra,* 58 Cust. Ct. at 674. Further, the record establishes that the exporter sells other types of wooden coat hangers, both in the home markets of Yugoslavia and to third countries, at a price spread between first and second quality which approximates, percentage-wise, that negotiated on sales of the imported merchandise to this country during the period involved. *Ibid.* Also, the undisputed testimony of the president of plaintiff-importer shows that the differentiation in prices paid for first and second quality hangers was continued in prices it received in this country on sales by it to its customers. If nothing else, such testimony corroborates the existence of a two-quality system in the marketing of Yugoslavian lacquered coat hangers.

Beyond this, coming to the main issue in the case, the record demonstrates that the lacquered hangers in question are second quality, as claimed by plaintiff, rather than first quality, as indicated by the appraisement. On this aspect, it has previously been indicated that in the prior case the court held that while the evidence showed there were two distinct grades of lacquered hangers, plaintiff had failed to prove that the lacquered hangers in question were second quality since no samples thereof were offered into evidence nor other proof made that the lacquered hangers were of second quality. *Mantell Export Co.* v. *United States, supra,* 58 Cust. Ct. at 672. As the court pointed out: "There are standards to be applied, but no representative articles which can be examined in the light of such standards to determine conformity therewith." *Ibid.* On the basis of the record in the present case, however, it is clear that these deficiencies in plaintiff's proof have been overcome. First, it is to be noted that plaintiff's witness, possessing a knowledgeable background on the manufacture and sale of Yugo-

slavian wooden coat hangers and particularly familiar with such sales to plaintiff, testified that a first quality lacquered hanger is a perfect one in structure and appearance. A second quality lacquered hanger, on the other hand, is one that is less than perfect, containing one or more manufacturing defects that primarily affect appearance, not usability, including such defects as knots, chipped lacquer, open joints, spots and air bubbles. These same distinctions between first and second quality lacquered hangers are contained in the written agreements between the buyer and seller, although in more general terms. Withal, the record makes clear that there exists an acceptable toleration or deviation from the theoretical 100 percent in the selecting and packing of first or second quality hangers into cartons of one hundred since the hangers are sold not by the piece but by the carton. However, this deviation should usually not be more than 10 percent so that the vast majority of hangers in a second quality carton should be second quality hangers.

Plaintiff's second witness corroborated the previous witness' testimony with respect to the criteria used in selecting first and second quality merchandise. He further explained that purchasers of second quality hangers were normally manufacturers of cheap garments, interested less in appearance and more in cutting corners in marketing their goods. In sum, the testimony of these two witnesses established the physical as well as commercial existence of first and second quality lacquered Yugoslavian hangers.[4]

Added to this, plaintiff's witness identified plaintiff's exhibit 4—a sampling of 12 hangers that were representative of invoiced second quality lacquered hangers—as second quality merchandise in view of the fact that each contained one or more specifically described imperfections or defects. Further, the court has made an independent visual examination (1) of each of the 12 hangers comprising plaintiff's exhibit 4; (2) of each of the 88 hangers comprising plaintiff's exhibit 5—which exhibit consists of the remainder of the carton of merchandise invoiced as second quality lacquered hangers; and (3) of each of the 100 hangers comprising plaintiff's exhibit 6—which exhibit consists of a representative carton of first quality lacquered hangers. See note 2, *supra*. Based on this examination, the court has determined that the vast majority of the 100 hangers in the second quality carton— i.e., plaintiff's exhibits 4 and 5—had one or more imperfections or defects ,while the vast majority of 100 hangers in the first quality carton—i.e., plaintiff's exhibit 6—lacked imperfections or defects. In

---

[4] By contrast, the government's witness, admittedly lacking any knowledge of how Yugoslavian or other imported lacquered hangers were traded and, further, not having manufactured lacquered wooden hangers for a quarter of a century, offered no relevant or competent evidence on this issue. The most that can be said about his testimony concerning the lacquered hangers in evidence is that his notion of a second quality lacquered hanger differs from that of the merchants buying and selling such merchandise.

short, not only is the physical and commercial existence of first and second quality lacquered Yugoslavian hangers established by the record, examination of the samples in evidence shows that the lacquered hangers which were invoiced as second quality were, in fact, of second quality within the criteria established by the buyer and seller in their dealings.

In light of the foregoing considerations, the court makes the following findings of fact and conclusions of law:

### FINDINGS OF FACT

1(a). The merchandise covered by the consolidated appeals for reappraisement in this case consists of wooden coat hangers of the wishbone type, both lacquered and unlacquered, exported from Yugoslavia between November 1963 and February 1967.

(b) The merchandise does not appear on the Final List, T.D. 54521.

2. The appraisements herein are contested only with regard to second quality hangers, identified on the invoices with the suffix "X", and/or the word "seconds," and/or the letters "sec."

3. The basis of appraisement was export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956.

4. With respect to the invoiced second quality unlacquered hangers, the prices at which such or similar merchandise was freely sold, or, in the absence of sales, offered for sale in the usual wholesale quantities and in the ordinary course of trade for exportation to the United States, including the cost of all containers and coverings of whatever nature, and all other expenses incident to placing the merchandise in condition, packed ready for shipment to the United States, were those, for each of the appropriate periods of exportation, agreed to in paragraph 3 of joint exhibit 1 which is incorporated by reference.

5. With respect to the second quality lacquered hangers, additionally identified on the invoices with the word "lacquered," or the letters "laq," and/or the word "walnut," or "maple," or "red," or "black," or "gold," sales were made during the relevant period to the plaintiff herein as a selected purchaser; the principal market for such sales was the office of the seller, Slovenijales, in Ljubljana, Yugoslavia; the usual wholesale quantity was 1,000 pieces; such sales were made in the ordinary course of trade, with no restrictions imposed on disposition or use; the invoice unit prices included the cost of all containers and coverings and all other expenses incidental to placing the merchandise in a packed condition, ready for shipment to the United States.

6. Such sales were made pursuant to arm's length transactions resulting in written agreements covering, among other things, the prices, quantities and qualities of such merchandise so sold.

7. Plaintiff's uncontradicted evidence establishes, prima facie, that the invoice prices for second quality lacquered hangers fairly reflect their market value.

8. The competent evidence of record establishes a physical as well as a commercial difference between invoiced first quality and second quality lacquered hangers.

### Conclusions of Law

1. Export value, as defined in section 402(b) of the Tariff Act of 1930, as amended, is the proper basis of appraisement.

2. Such statutory export values for the invoiced second quality unlacquered hangers, as identified in finding of fact 2, are the various contract prices, less undisputed charges and depending upon the dates of entry, contained in paragraph 3 of joint exhibit 1, incorporated by reference in finding of fact 4.

3. Such statutory export values for the invoiced second quality lacquered hangers, as identified in findings of fact 2 and 5, are the same as those for the unlacquered hangers in conclusion of law 2, except for 1967 shipments wherein export value is $125.00 per 1,000 pieces, less the pro rata share of the items of ocean freight and marine insurance, as invoiced.

Judgment will issue accordingly.