**UNITED STATES**, Appellant,

v.

**CONTINENTAL FWDG. COMPANY**
**et al., Appellees.**

**A.R.D. 270; Reappraisement R60/2082**
**and four others.**

United States Customs Court,
Second Division, Appellate Term.

April 7, 1970.

Before RAO, Chief Judge, and FORD and NEWMAN, Judges.

RAO, Chief Judge.

This application for review again brings before the court the question of the propriety of appraisements based on the so-called "MITI" or "check" prices.

Basically, the facts are as follows: The imported merchandise, binoculars, could not be exported from Japan without an export license issued by the Ministry of International Trade and Industry (MITI), an administrative agency of the Japanese Government. MITI would not approve an application for an export license unless it appeared that the purchase price of the merchandise was not lower than the standards adopted by it, which became known as check prices or MITI prices. No price lists were published by MITI but exporters learned what the approved prices were through experience in applying for licenses. The exporter also had to show, normally by letter of credit, that the merchandise was being paid for in the proper amount of foreign currency. It developed, however, that the importers were unwilling to buy at MITI prices, and the following practices arose:

   \* \* \* A person seeking to import binoculars into the United States would select a Japanese supplier. A contract would be entered into wherein the importer would agree to purchase the binoculars described in the contract. Two prices would be set forth in the agreement, the higher price being the MITI price and the lower price being the "contract price." The difference between the MITI price and the contract price would be paid to the importer in Japanese yen which was available for use in Japan only, for any purpose except the purchase of goods on the MITI list. After the contract was executed, the importer opened a line of credit in American dollars equal to the amount of the MITI prices for the goods and the Japanese yen would be deposited to the account of the importer. [United States v.

William D. Ruckelshaus, Asst. Atty. Gen. (Glenn E. Harris, New York City, trial atty.), for appellant.

Sharretts, Paley, Carter & Blauvelt, New York City (Joseph F. Donohue, New York City, of counsel), for appellees.

Continental Forwarding, Inc., 53 CCPA 105, 108, C.A.D. 885 (1966).]

The merchandise herein was appraised at the MITI prices and is claimed to be dutiable at the contract prices. Plaintiffs-appellees contend that no sales were made at the MITI prices and that the merchandise was freely sold at the contract prices. It is the Government's position that there were sales at the MITI prices; that such prices were the only legal ones for the merchandise; that the procedures through which the merchandise was exported and the difference between the MITI price and the contract price paid to or for the account of the importer involved violations of Japanese law; that the course of trade here in issue was not ordinary; and that prices lower than the MITI prices were an improper basis upon which to find export value.

Various aspects of this issue have been before the courts on prior occasions. United States v. Baar & Beards, Inc., 46 CCPA 92, C.A.D. 705 (1959); United States v. Continental Forwarding, Inc., 53 CCPA 105, C.A.D. 885 (1966).

The record in the last cited case has been incorporated herein and it has been stipulated that the merchandise here consists of prism binoculars, similar in all material respects to those in the incorporated case. It has also been stipulated:

4. Said merchandise was appraised at the so-called MITI check prices prevailing on the respective dates of exportation, as was the merchandise in Customs Appeal 5175, on the basis of export value, as defined in 19 U.S.C. Sec. 1401a(b), and said statutory basis of appraisement is not challenged by either party.

5. At all times relevant to these cases, prism binoculars were subject, on exportation, to MITI regulations; the procedure followed for purchasing and paying for the merchandise at bar was the same as that described in Customs Appeal 5175; and the procedures required to be followed in obtaining export licenses and permits for merchandise subject to MITI regulations were the same throughout the period involved in Customs Appeal No. 5175 and in these appeals.

6. If the Court finds that the appraised values are not correct then it is agreed that the prices stated on the commercial invoices, plus 3%, represent all the elements of statutory export value, under 19 U.S.C. Sec. 1401a (b), and that said invoices may be received in evidence without being marked.

Appellant has presented additional evidence in the instant case, consisting of a report from the office of the U.S. Regional Customs Representative in Japan, including the written responses of MITI and of the Japanese Ministry of Justice to a series of inquiries by the U.S. Department of Justice (exhibit F); an affidavit of Arthur K. Mori, a member of the bars of the State of Connecticut and of Japan, who is engaged in the practice of law in Tokyo (exhibit G), and the testimony of Timothy S. Williams, an attorney who has studied Japanese law and was previously employed by the law firm of which Mr. Mori is a member. Appellees presented the testimony of George Yamaoka, a member of the New York bar, who has practiced law in the United States and in Japan, and has been primarily engaged in transactions connected with Japanese-United States trade, and is generally familiar with the Japanese laws affecting those transactions.

The trial court held that in the instant case MITI prices do not represent export value because no sales were made at such prices. Continental Fwdg. Company et al. v. United States, 297 F.Supp. 1396, 62 Cust.Ct. 915, R.D. 11659 (1969). It also held that the evidence directed at violation of Japanese law was irrelevant and immaterial in the determination of the proper value of the merchandise, and that the contract prices, rather than the MITI prices, represented dutiable export

value. The court stated in the course of its opinion:

\* \* \* In my opinion, the evidence directed to the purported violations of the laws of Japan, even if true, is irrelevant and immaterial in the determination of the proper value of the involved merchandise. The evidence here establishes that Japanese export control laws required the true transaction to be reflected in the papers tendered with the application for an export license. Specifically, the Government's position is that the violation would be in the failure to indicate that a rebate was due from the amount stated on the invoice and that the transfer of such rebate to or for the account of a nonresident, *if done without a license*, would violate a Japanese currency control law. However, the testimony of defendant's witness in this case indicates that the contract of sale itself was lawful, even to a claim on the part of the purchaser for a rebate. Accordingly, not only did the purchaser of the merchandise in this case obtain good title to the goods but it could obtain judgment in its favor for a rebate which was not paid in accordance with the contract. The *enforcement* of the judgment itself would require a license (R. 45–46, 47). The record indicates that "legal alternatives" existed for the collection of such rebates.

The witness for the plaintiffs also agreed that contracts of the type involved in such circumstances as those at bar involving a rebate, while subject to prosecution or while involving the possibility of a prosecution were in themselves, legal (R. 70). What illegalities are alleged occurred *subsequent* to the sales transaction and did not vitiate, in my opinion, the price at which the merchandise was freely sold. (Section 402(b), Tariff Act of 1930, as amended). Violations or irregularities which may occur after the sale or agreement to sell cannot affect the market value or price of the merchandise under consideration. While the

additional evidence adduced in this case may fairly be said to establish that the procedures employed subsequent to the purchase of the subject merchandise involved violations of certain export laws and fiscal regulations of Japan, that fact did not change the contract price as one entered into freely between the purchaser and seller. Even sales in violation of the rules or regulations of a semiofficial Government agency may nevertheless form a valid basis of appraisement. (See, United States v. Biddle Purchasing Co. et al., 21 Cust. Ct. 297, Reap.Dec. 7616 (1948).) [Emphasis quoted.]

According to the record presented, at the time of these exportations there was in effect in Japan a statute entitled "The Foreign Exchange and Foreign Trade Control Law (Law No. 228, December 1, 1949)," as amended, which provided, *inter alia:*

(Purpose)

Article 1. The purpose of this Law is to provide for the control of foreign exchange, foreign trade and other foreign transactions, necessary for the proper development of foreign trade and for safeguarding of the balance of international payments and the stability of the currency, as well as the most economic and beneficial use of foreign currency funds, for the sake of the rehabilitation and the expansion of the national economy.

\*　　\*　　\*　　\*　　\*　　\*

(Principle of export)

Article 47. Export of goods from Japan will be permitted with the minimum restrictions thereon consistent with the purpose of this Law.

(Approval of export)

Article 48. Any person desiring to export goods from Japan may be required to obtain the approval of the Minister of International Trade and Industry for those types or areas of destination of export goods and/or method of transactions or

payments as provided for by Cabinet Order.

2. The restrictions provided for by Cabinet Order specified in the preceding paragraph shall be within the limit of necessity for the maintenance of the balance of international payment and sound development of international trade or national economy.

(Certification of payment method)

Article 49. The Minister of International Trade and Industry may by ordinance require from any person desiring to export goods an adequate certification that satisfactory payment is provided as provided for by Cabinet Order.

\*　　\*　　\*　　\*　　\*　　\*

(Sanction)

Article 53. The Minister of International Trade and Industry may prohibit any person who, in connection with the export or import of goods, has violated the provisions of this Law, ordinances or measures based thereon, fron engaging in export or import transactions for a period not exceeding one year.

Pursuant to the above, and under the Export-Import Transaction Law (Law No. 299, of 1952, as amended), MITI established minimum export price requirements known as check prices as its standard for the issuance of export licenses. In order to export merchandise an exporter was required to obtain an export license from MITI, a "certificate of method of payment" from an authorized foreign exchange bank, and an export permit from the chief of a customhouse.

To secure MITI approval, an applicant was required to indicate the merchandise, unit price, total price, destination and method of settlement. Presentation of the export contract and a letter of credit was required as evidence of the declared sale prices. MITI relied on said documents in determining whether or not the price was appropriate. It did not approve applications at lower than check prices.

To obtain a certificate of method of payment, the exporter had to present to the bank an export declaration together with the documents specified therein, which included the invoice.

In filing an application for an export permit, an applicant was required to state the value, quantity, price and destination of the merchandise.

In actual practice, the MITI prices were not adhered to and the procedures outlined above developed. They were not unusual but were frequently undertaken and were a matter of common knowledge.

There is considerable evidence, however, that the transactions involved violations of Japanese law and regulations in two respects: (1) In the use on an application for an export license of an invoice which misrepresented the sales price actually agreed upon, which is in violation of Article 113–2 of the Customs Law and is punishable by imprisonment and/or fine and (2) in rebating or paying the difference between the contract price and the MITI price to the importer or his agent, since under Article 27 of the Foreign Exchange Law payments could not be made by a Japanese exporter to or for the account of a nonresident without a license. Although several witnesses testified in the incorporated case that they had actually used the rebated yen for various purposes in Japan, it was Mr. Mori's opinion that they were not *legally* available for any purpose. Mr. Williams said that the funds were illegally obtained in the first place, even though used thereafter to make lawful expenditures.

Copies of four decisions of Japanese courts holding that the payment of rebated yen to non-residents was a violation of Article 27, were received in evidence as a part of exhibit G.

In one of the cases, State v. Gosho Co., Ltd., et al., the court discussed the situation and indicated that the reason for the accrual of the deposited yen was the existence of the check price system. It

pointed out that the check price system tended not to correspond to the market price and that that fact should be considered in weighing the gravity of the alleged offense. However, it found no merit in the argument that the Japanese trading companies were forced to comply with requests of foreign trading companies for law price transactions and that it was not impossible to expect the Japanese trading companies to refrain from the practice. It pointed out that the Japanese trading companies could have collectively pressed MITI and other governmental agencies for changes. It added:

> Furthermore, even if such transactions at low prices were unavoidable, one cannot say that no lawful alternations existed to earmark and dispose of the differentials accruing from such transactions. The surreptitious act of receiving payments in yen in Japan cannot be tolerated from the standpoint of the government enforcing control over foreign exchange, and we refuse to believe that, in normal situations, it is impossible to expect Japanese trading companies to refrain from settling said differentials in such manner.

Mr. Williams testified that the term "lawful alternations" in said decision meant "lawful alternatives." He said that the court was supposing, in his opinion, and correctly, that there would have been some lawful means for the defendants to dispose of the yen they had accrued.

There was also considerable testimony as to what would happen if a Japanese seller refused to make the accrued rebate and an American importer instituted suit in a Japanese court. It was the opinion of both Mr. Williams and Mr. Yamaoka that the court would enter judgment for the plaintiff but that the judgment could not be collected without a license from the foreign exchange authorities. Mr. Williams said that such a license would not be issued because it would be contrary to the policy of the law. In Mr. Yamaoka's view, if such a license were granted, the transaction would be validated.

In spite of the fact that it was the opinion of MITI that procedures of the type involved herein constituted violations of the law, no sanctions were imposed because of the difficulty of linking rebates with the goods exported. In a few cases, approval of exports was refused.

In the responses of the Japanese Ministry of Justice, attached to exhibit F, it is stated that 340 indictments were returned during 1957 for violation of various provisions of the foreign trade law. Sixty-two of them charged violation of Article 27 and approximately half of those arose from rebates or refunds of Japanese currency in connection with the check price system. The records of the Ministry of Justice do not reflect the outcomes of the indictments but the Ministry referred to five decisions representing successful prosecutions. It was Mr. Williams' opinion that the relatively small ratio of prosecutions was due to the difficulty of proving such cases.

Appellant claims that the court erred in finding and holding that no sales were made at MITI prices and in not finding and holding that the burden of proving such fact rested on appellees and that appellees produced no substantial evidence on this point.

In our view, the preponderance of the evidence establishes that these binoculars were not freely sold in accordance with our statutes at MITI prices in the actual course of trade in Japan during the period with which we are concerned.

It was held in the incorporated case that the evidence did not support a finding that the MITI minimum price fairly represented the statutory export value of the merchandise, nor that the MITI price ever inured to the exporter. No additional evidence has been presented on this point. Any presumption that the merchandise was freely sold at MITI prices has been overcome by the evidence of the actual trade practices whereby binoculars were freely bought

and sold at prices lower than the MITI prices. While price fixing by an association or Government agency may not preclude a finding of value based on such prices, if they are disregarded in the actual course of trade, they do not establish dutiable value under the statute. United States v. Michele Diagonale, 22 CCPA 517, T.D. 47497 (1935); A. Goldmark & Sons Corp. v. United States, 15 Cust.Ct. 431, Reap.Dec. 6225 (1945); United States v. Biddle Purchasing Co. et al., 21 Cust.Ct. 297, Reap.Dec. 7616 (1948). We find no error in the holding of the trial court.

Appellant claims further that the transactions by which the merchandise was purchased and exported from Japan involved violations of Japanese law and that the court erred in not holding that their illegality removed them from the ordinary course of trade and in not holding that the rebates subsequently made to appellees did not diminish the purchase price of the merchandise.

In considering these questions, we note that the sole function of this court in the instant case is to determine the value of the merchandise in accordance with section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956. The parties have agreed that export value is the proper basis for determining dutiable value. That value is defined as follows:

(b) For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

"Ordinary course of trade" is defined in section 402(f) (2), as follows:

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

So far as is pertinent, the statute defines "freely sold, or in the absence of sales, offered for sale" as sold or offered to all purchasers at wholesale. Such purchasers are defined in the first instance as those who buy in usual wholesale quantities for industrial use or for resale otherwise than at retail. (Section 402(f) (1) (A) and section 402(f) (3).)

Market value has been defined as the price at which a manufacturer offers his merchandise for sale, the price at which he offers it in the market, and the price he is willing to receive and the purchaser is willing to pay. United States v. Alfred Kohlberg, Inc., 2 Cust.Ct. 849, Reap.Dec. 4526 (1939), aff'd 27 CCPA 223, C.A.D. 88 (1940); United States v. Acme Steel Company, 50 Cust.Ct. 529, A.R.D. 152 (1963), aff'd 51 CCPA 81, C.A.D. 841 (1964).

Offers which are not accepted do not meet the requirements for establishing export value as against actual sales at a lower price freely offered to all purchasers. Superior Merchandise Company v. United States, 54 Cust.Ct. 781, A.R.D. 185 (1965).

The statutory scheme is aimed at determining value on the basis of unrestricted dealings between willing buyers and willing sellers. In the instant case, it is clear that the price, insofar as the buyer and seller were concerned, was the contract price. If any offers were made at MITI prices, they were not accepted, but the merchandise was freely sold at contract prices. Under section

402(b), *supra*, where there are actual sales, offers may not be considered. Louis Goldey Co., Inc. v. United States, 55 Cust.Ct. 759, A.R.D. 196 (1965); W. J. Byrnes & Company v. United States, 50 Cust.Ct. 406, Reap.Dec. 10451 (1963), appeal dismissed United States v. W. J. Byrnes & Company, 50 Cust.Ct. 574, A.R.D. 158 (1963).

Must the contract price be disregarded, nevertheless, because of alleged violations of Japanese law?

The alleged violations—misrepresentation in the documents presented to obtain the required export license, and rebates in yen of the difference between the MITI price and the contract price to or for the account of the importer—carried penalties under Japanese law. There is no evidence that any prosecutions were commenced or sanctions imposed in connection with the instant transactions. In fact the record indicates that very little action was taken by the Japanese authorities as to alleged offenses in connection with the purchase, sale and exportation of goods covered by MITI controls, although the practices followed by the Japanese trading companies and American importers were generally known.

The underlying problem is whether export value may be found on the basis of a contract price where the contract is part of a larger transaction some aspects of which, according to the expert witnesses, involved violations of Japanese law or regulations.

These witnesses testified that the contract of purchase itself was legal and that in an action upon it for nonpayment of the difference between the MITI price and the contract price, a judgment would be rendered for the plaintiff, although it could not be enforced unless a license for the payment were issued. There is nothing in the record to indicate that the contract price *per se* was illegal under Japanese law. According to the statement of the MITI authorities (exhibit F), violations of check price as such were never referred to the police or the public procurator for criminal prosecution and "there was no such case charged as violation of check price." Criminal prosecution was effected in some cases under the charge of forgery of documents or illegal remittance. In Nomura Trading Co., Ltd. v. State (exhibit G), it was stated in the opinion of the Tokyo High Court, Third Criminal Division, that the creation of the so-called deposited yen obligation by a resident to a nonresident was permitted and was not within the restrictions and prohibitions provided for in the Foreign Exchange Law. It was held, however, that actual payment of deposited yen to a nonresident was not free from punishment as a violation of Article 27 of that law.

Mr. Williams testified:

* * * Article 90 [of the Civil Code] specifies that legal acts—this includes contracts—which violate so-called public order and good, more or less shall be void.

Now, in applying this provision of the Civil Code to transactions in violation of criminal provisions, in effect a two pronged standard has been developed. The courts have held that acts which violate merely regulatory legislation are not, because of the criminal acts, void in themselves as civil transactions. * * * The other category, void statutes [sic], is a category which is best translated by restricted legislation. * * *

Now, the Foreign Exchange and Foreign Trade Control Law violations which have so far come before the Courts have been, in most instances, found to be in the regulatory category. The Courts have therefore said the underlying transaction is not void. The Court, in each case which I have read, has also said, "Of course, we are not passing on the criminal aspect." In fact, states that the criminal section exists, and is the means of securing compliance.

You do, in the Foreign Trade area, have the special, additional factor of the governmental licensing system—

and this, in may opinion, is the reason that the courts have felt free to hold the underlying contract valid, because they are in a position still to leave the administrative agency in a position of control by requiring a license for enforcement of the judgment.

It thus appears to be the position of the Japanese authorities that the contract and the obligations thereunder were not void for all purposes although aspects of the entire transaction might involve violations of Japanese law and sanctions might be imposed.

■ Even under American law, there are exceptions to the general rule that an agreement which violates a provision of a statute or which cannot be performed without violating a statute is illegal and void. 17 Am.Jur.2d, Contracts §§ 165, 166, 219; 55 A.L.R.2d 481. Where an agreement or obligation is only incidentally, indirectly or remotely connected with an illegal transaction, it will generally be enforced if it is supported by an independent consideration, so that plaintiff does not require the aid of the illegal transaction to make out his case. D. R. Wilder Manufacturing Co. v. Corn Products Refining Co., 236 U.S. 165, 35 S.Ct. 398, 59 L.Ed. 520 (1915); 17 Am.Jur.2d, Contracts §§ 158, 219. If any part of such an agreement is valid, it will avail *pro tanto*, though another part may be prohibited by statute, provided the statute does not, either expressly or by necessary implication, render the whole void, and provided the sound part can be separated from the unsound and enforced without injustice to the defendant. 17 Am.Jur.2d, Contracts § 230.

■■ Moreover, a contract although in violation of a statute, will not be declared void if it was not the intent of the legislature to make it illegal and void. John E. Rosasco Creameries, Inc. v. Cohen et al., 276 N.Y. 274, 11 N.E.2d 908 (1937); 55 A.L.R.2d 481, 487. Penalties other than declaring the contract void may be imposed by the legislature and the courts will not affix an additional penalty not intended by the legislative body. Dunlop v. Mercer et al., 8 Cir., 156 F. 545, 555 (1907). The intent of the legislature is to be determined by the language of the statute, its nature, object, purpose, subject matter, the wrong it seeks to prevent, the class of persons to be controlled, and the legislative history. 17 Am.Jur.2d, Contracts §§ 165, 166; 17 C.J.S. Contracts § 201; 55 A.L.R.2d 481, 488–489. The whole statute must be examined in order to decide whether it intended to avoid a contract made in contravention hereto. Harris v. Runnels, 12 How. 79, 85, 13 L.Ed. 901 (1851).

A distinction may also be made "between statutes 'which forbid certain contracts to be made or certain acts to be done' and 'those which prescribe a certain mode and manner of doing the act, or the procedure to be followed in making the contract,' the inference being that a violation of a statute of the latter kind does not necessarily render a contract void." 55 A.L.R.2d 481, 491.

■ We are not concerned with the enforcement of the contract itself or of Japanese law. Our only interest is whether the contract price is so tainted with illegality as to require this court to disregard it in determining the statutory value of the merchandise. According to the record, the Japanese law and the Japanese authorities themselves do not consider the contract to be without legal significance. Moreover, they have allowed the trade practices described above to continue for a period of years without taking much action to stop them. Under these circumstances, we do not regard the contract price as a nullity for the purpose of finding dutiable value. Value under our statutes is the price at which merchandise is freely sold in commercial transactions between willing buyers and willing sellers. We conclude that in the instant case the price at which the merchandise is actually sold in the markets of Japan for exportation to the United States in a course of trade which has developed and become normal over a reasonable period of time is not to

be excluded from consideration in ascertaining export value under section 402 (b), *supra*, because some actions taken in connection with the exportation of the merchandise or in making payments or rebates may have been contrary to Japanese law and regulations.

On the record presented and in view of the stipulation of the parties, we hold that the proper basis for determining the value of the within merchandise is export value, as that value is defined in section 402(b) *supra*, and that that value is represented by the invoice prices plus 3 percent. We affirm the findings of fact and conclusions of law of the trial judge, which we incorporate by reference. Judgment will be entered accordingly.