59 CCPA

The UNITED STATES, Appellant,

v.

CONTINENTAL FORWARDING CO., Inc., et al., Appellees.

Custom Appeal 5415.

United States Court of Customs and Patent Appeals.

Aug. 10, 1972.

L. Patrick Gray, III, Asst. Atty. Gen., Andrew P. Vance, Chief, Customs Section, Glenn E. Harris, New York City, for the United States.

Sharretts, Paley, Carter & Blauvelt, New York City, attorneys of record, for appellees. Joseph F. Donohue, New York City, of counsel.

Before RICH, Acting C. J., ALMOND, BALDWIN and LANE, Judges, and RE, Judge, United States Customs Court, sitting by designation.

LANE, Judge.

This is an appeal by the Government from the decision and judgment of the Appellate Term of the Customs Court, 64 Cust.Ct. 838, A.R.D. 270, 311 F.Supp. 956 (2d Div.1970), holding the appraisement of certain binoculars imported from Japan to have been erroneous. It arises under essentially the same facts as United States v. Continental Forwarding, Inc., 53 CCPA 105, 106, C.A.D.

885 (1966), which Judge Smith, writing for this court, summarized as follows:

This appeal stems from an appeal to reappraisement in which the sole problem below was concerned with determining export values of the binoculars for customs purposes. The exportation of binoculars from Japan is controlled to some extent by an agency of the Japanese Government, the Ministry of International Trade and Industry (hereafter MITI). In order to import the binoculars, appellee was required to deposit a certain amount of U. S. dollars in Japan. In return appellee received the binoculars and a certain amount of Japanese yen [corresponding to the difference between the MITI "check" prices and the actual contract price agreed upon by buyer and seller]. The Government's position here is that the amount of U. S. dollars deposited in Japan, which the appraiser adopted as the export value, is the proper export value. Appellee argues the export value is less than this amount because of the Japanese yen received along with the binoculars.

The foregoing summary of essential facts provides a ready guide for examination of the dispute in greater detail.

In the previous *Continental* case, the single judge held the appraisement to have been correct, 46 Cust.Ct. 579, R.D. 9910 (1961) (Oliver, C.J.). However, the Appellate Term reversed, 52 Cust. Ct. 629, A.R.D. 171 (1964), and this court affirmed the judgment of the Appellate Term. The Government felt that the reason for the importer's success was the failure of the record to convincingly demonstrate the illegality under Japanese law of exportation at lower than MITI "check" prices. The present case involves binoculars imported later than those involved in the previous case, but under the same circumstances, and appraisement here was also at MITI, rather than the lower contract, prices. At trial further evidence was introduced bearing on the legality of the transac-

tions under the law of Japan, and appellant asserts that the present record makes clear the illegality of such transactions. The single judge below nevertheless held the appraisement to have been erroneous, 62 Cust.Ct. 915, R.D. 11659, 297 F.Supp. 1396 (1969) (Watson, J.), and the Appellate Term affirmed. We agree and affirm the judgment of the Customs Court.

In addition to the evidence introduced in the trial below, a stipulation of the parties was entered. It provides in pertinent part as follows:

2. The record in United States v. Continental Forwarding, Inc., Customs Appeal 5175, [53 CCPA 105,] C.A.D. 885, may be incorporated in and made a part of the record herein.

3. The merchandise here consists of prism binoculars, similar in all respects herein material to the prism binoculars which were the subject of said Customs Appeal 5175.

4. Said merchandise was appraised at the so-called MITI check prices prevailing on the respective dates of exportation, as was the merchandise in Customs Appeal 5175, on the basis of export value, as defined in 19 U.S.C. Sec. 1401a(b), and said statutory basis of appraisement is not challenged by either party.

5. At all times relevant to these cases, prism binoculars were subject, on exportation, to MITI regulations; the procedure followed for purchasing and paying for the merchandise at bar was the same as that described in Customs Appeal 5175; and the procedures required to be followed in obtaining export licenses and permits for merchandise subject to MITI regulations were the same throughout the period involved in Customs Appeal No. 5175 and in these appeals.

6. If the Court finds that the appraised values are not correct then it is agreed that the prices stated on the commercial invoices, plus 3%, represent all the elements of statutory export value, under 19 U.S.C. Sec. 1401a(b), and that said invoices may

be received in evidence without being marked.

Export value, the stipulated basis for determining dutiable value, is defined in § 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, as:

* * * the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

Section 402(f) defines the terms used in § 402(b) in pertinent part as follows:

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise.

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the mer-

chandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

## Is MITI Price a Proper Basis for Appraisement?

The court below first found and held that:

In actual practice, the MITI prices were not adhered to and the procedures outlined above developed. They were not unusual but were frequently undertaken and were a matter of common knowledge.

\* \* \* \* \* \*

In our view, the preponderance of the evidence establishes that these binoculars were not freely sold in accordance with our statutes at MITI prices in the actual course of trade in Japan during the period with which we are concerned.

It was held in the incorporated case that the evidence did not support a finding that the MITI minimum price fairly represented the statutory export value of the merchandise, nor that the MITI price ever inured to the exporter. No additional evidence has been presented on this point. Any presumption that the merchandise was freely sold at MITI prices has been overcome by the evidence of the actual trade practices whereby binoculars were freely bought and sold at prices lower than the MITI prices.[1]

The Government argues, however, that:

It must be presumed * * * that the minimum export prices thus set by the Japanese Government were observed by a sufficient proportion of Japanese sellers that such prices were indeed freely offered to American importers. The testimony that "large groups" of Japanese sellers evaded the MITI check prices implies in and of itself that there were at least *some* Japanese sellers who complied with the

---

1. 64 Cust.Ct. at 843–845, 311 F.Supp. at 960–961.

law, and hence, who offered and sold such merchandise in complaince with the applicable MITI check prices.

If *some* Japanese exporters sold such merchandise in compliance with the laws of Japan, it stands to reason that many others attempted to do so by offering the merchandise at check price, even though the pressure of competition from the less scrupulous may later have compelled them to agree to illegal rebates.

■ It is apparent that the appellant's argument is largely speculative. There is no evidence that as a practical matter Japanese exporters offered binoculars to American importers at MITI prices, and the finding of the trial court was that they certainly were not freely sold at such prices. In any event, the position of the Government in the previous *Continental* case was that MITI prices provided a proper basis for appraisement, but this court expressly approved the lower court's holding that:

> The evidence does not support a finding that the MITI minimum prices fairly represented the export value of the imported merchandise within the purview of section 402(b) of the Tariff Act of 1930, as amended * * *.[2]

We find that the Government has presented no further evidence on this point and conclude that the Appellate Term was correct in holding MITI price not to be a proper basis for appraisement.

*Was the Practice of Selling Binoculars at Less than MITI Prices Normal in the Trade?*

■ A question related to the propriety of MITI price as a basis for export value is whether the practice of evading it was normal in the trade. From the preceding section of this opinion it is clear that the Customs Court regarded the evidence to establish that it was normal in the trade. The Government's argument to the contrary has

been set forth above. It is based not on fact, but on surmise. Recognizing that this court will not disturb the findings of fact of an Appellate Term of the Customs Court "if there is 'any substantial evidence' in support of those findings," A. Zerkowitz & Co. v. United Stats, 435 F.2d 576, 581, 58 CCPA 60, 66 (1970), cert. den., 404 U.S. 831, 92 S.Ct. 72, 30 L.Ed.2d 60 (1971), we see no basis for disturbing the Appellate Term's finding in this case that the practice of selling at less than MITI prices, however illegal it might have been, was in fact the normal trade practice.

*Even if Normal in Fact, Could an Illegal Practice Be Considered To Be in the "Ordinary Course of Trade" as a Matter of Law?*

The Government's principal contention is that however common the practice of evading the minimum prices fixed by MITI might have been, it cannot, as a matter of law, be the basis for export value since it was, the Government vigorously asserts, illegal. There is much evidence in this case as well as in the incorporated case tending to prove that the various transactions engaged in by the Japanese exporter and American importer were violative of certain of the revenue and criminal laws of Japan. The assessment of this evidence by both the single judge and the Appellate Term led them to the conclusion that the contract price per se was not illegal. Said the Appellate Term:

> We are not concerned with the enforcement of the contract itself or of Japanese law. Our only interest is whether the contract price is so tainted with illegality as to require this court to disregard it in determining the statutory value of the merchandise. According to the record, the Japanese law and the Japanese authorities themselves do not consider the contract to be without legal significance. Moreover, they have allowed the trade practices described above to continue for a period of years without

taking much action to stop them. Under these circumstances, we do not regard the contract price as a nullity for the purpose of finding dutiable value.[3]

What the court apparently had in mind was certain testimony to the effect that if an American importer were to sue on the contract for the difference between the contract and MITI prices, he could obtain judgment, although collection might be difficult or impossible because of the illegality of the evasion of MITI prices.

The Government regards as untenable any attempted distinction in legality between the contract or contract price per se and other aspects of the sale here involved. Satisfied that the transactions were wholly illegal, the Government contends that:

> In the context of the decisions in the incorporated case, * * * the clear inference of this Court was that, if competent and substantial proof of the illegality of the trade practice in issue had been before it, it would have held the subject transactions not to be "in the ordinary course of trade," as indeed the single judge indirectly held in the prior case * * *. Whether a "square holding" in the form of a final decision, or a "precedent in precise point," exists or not, the course of trade here in issue is not "ordinary" either in the sense of "normal" or in the sense of public policy, which clearly should impel the court to avoid the encouragement of transactions in violation of the laws of foreign sovereigns or the reward of those privy to such violations.

We can find no "inference" in the prior *Continental* opinion to the effect that had illegality been proved, the court would have held the illegal practice to not have been in the "ordinary course of trade." The court merely found that illegality had *not* been proved and that it was essential to the Government's case. While there is some evidence to support the position of the Appellate Term on the illegality question, that position calls for the acceptance of a very fine distinction. The evidence now of record provides firmer support for the Government than did that in the incorporated case. However, in light of the approach we take, we need not specifically pass on the relative strength of the Appellate Term's and Government's positions in this regard. We therefore proceed on the assumption that contracting for less than MITI prices is illegal under the laws of Japan.

◼ Appellant has cited no authority for holding the involved practices not to be in the "ordinary course of trade," within the meaning of the statute, merely on the strength of their illegality. At most, the Government presents an argument founded on the equitable proposition that justice would be illserved if the statute were construed to allow the importer to profit from a scheme which is illegal in the exporting country. However, the penal laws of a foreign country are not enforced in the courts of this country, but must be enforced in the place where their violation occurs. See *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 414, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), and cases there cited. Moreover, we are not faced with a conflict of laws problem where the issue is which of the laws of one forum or another applies. It is clear and undisputed that the statute passed by the Congress of the United States is the "law" which governs the present proceeding.

◼ We are of the opinion that the legality of a trade practice is not relevant to the determination of expert value when that practice has in fact become "ordinary" in the trade. Appellee in this case has sustained the burden of proving that the merchandise was sold at the lower than MITI prices in the "ordinary course of trade" as that phrase is used in § 402(b), and defined in § 402(f) (2), supra, and we see no

3.  64 Cust.Ct. at 848–849, 311 F.Supp. at 964.

compelling reason to reject the plain meaning of the language of the statute in favor of an artificial construction which excludes the actual but illegal. To the extent that the importer gains from this holding, it does so at the risk of the penalties provided for under Japanese law. It seems wholly inappropriate for us to in effect "punish" the importer for breach of Japanese law when the Japanese authorities themselves have not done so. If steps have been taken to enforce the laws of Japan against this importer, then the penalties to be imposed would undoubtedly be those that the Japanese Government has concluded will best serve the goals of law enforcement in that country. We are in no position to decide that the imposition of a higher tariff would fit conformably with those goals.

■ We conclude that the Appellate Term was correct in holding the exportation of the binoculars here involved at lower than MITI prices to have been in the ordinary course of trade notwithstanding any illegality in the sale. We decline to distort the meaning of the statute to try to discourage a particular trade practice where the only effective discouragement must necessarily come from the nation in which the practice is prevalent.

### Can an Offer or Sale Be Free if It Is Illegal?

■ The Government finally takes the position that the only offer of sale of binoculars which could be "free" in Japan would be one which is based on the MITI minimum price. The Appellate Term regarded the offers and sales at less than MITI prices to be free since they were made to all willing purchasers in the usual wholesale quantities and in the ordinary course of trade within the meaning of the Tariff Act. We agree with the Customs Court's holding for the same reasons as stated in the preceding section. We do not consider the illegality of the sale or offer to be determinative where in fact the sale or offer is regularly made. Accepting, in the present case the fact that the subject binoculars were sold, as a normal practice, at less than MITI prices, we find no basis for concluding that the court below was in error in holding that they were freely offered and sold at such prices.

For the reasons set forth herein, the decision and judgment of the Appellate Term of the Customs Court is affirmed.

Affirmed.