SPANEXICO, INC.

v.

UNITED STATES.

C.D. 4616, Court No. 72–5–01089.

United States Customs Court.

Dec. 2, 1975.

---

12. 2 U.S.Code Cong. & Admin.News 1965, pages 3416, 3443.

Glad, Tuttle & White, Los Angeles, Cal. (Edward N. Glad and Robert Glenn White, Los Angeles, Cal., of counsel), for plaintiff.

Rex E. Lee, Asst. Atty. Gen. (Michael S. O'Rourke and Velta A. Melnbrencis, New York City, trial attorneys), for defendant.

MALETZ, Judge:

This action concerns the proper dutiable value of various items of furniture either of iron, iron and wood, iron and glass, or wood and glass that were manufactured by Gavaldon, S.A. of Tijuana, Mexico and exported into this country via the port of San Ysidro during the period from April 1970 through November 1970. The merchandise was appraised by the government on the basis of export value as defined in section 402(b) of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956, at certain per se values. Plaintiff Spanexico, the importer of the merchandise, agrees that export value is the proper basis for appraisement but contends that the invoice prices on the entries herein involved represent the proper dutiable values of the importations in question.[1]

### The Statute

Section 402 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1956 (19 U.S.C. 1401a) provides as follows:

(b) For the purposes of this section, the export value of imported merchandise shall be the price, at the time of exportation to the United States of the merchandise undergoing appraisement, at which such or similar merchandise is freely sold or, in the absence of sales, offered for sale in the principal markets of the country of exportation, in the usual wholesale quantities and in the ordinary course of trade, for exportation to the United States, plus, when not included in such price, the cost of all containers and coverings of whatever nature and all other expenses incidental to placing the merchandise in condition, packed ready for shipment to the United States.

\* \* \* \* \* \*

(f) For the purposes of this section—

(1) The term "freely sold or, in the absence of sales, offered for sale" means sold or, in the absence of sales, offered—

(A) to all purchasers at wholesale, or

(B) in the ordinary course of trade to one or more selected purchasers at wholesale at a price which fairly reflects the market value of the merchandise,

without restrictions as to the disposition or use of the merchandise by the purchaser, except restrictions as to such disposition or use which (i) are imposed or required by law, (ii) limit the price at which or the territory in which the merchandise may be resold, or (iii) do not substantially affect the value of the merchandise to usual purchasers at wholesale.

(2) The term "ordinary course of trade" means the conditions and practices which, for a reasonable time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement.

\* \* \* \* \* \*

### The Issues

Two questions are presented: First, whether or not the government appraisement is erroneous; second, if the appraisement is erroneous, whether plaintiff has proven by a preponderance of the evidence that its claimed values, i. e., the invoice prices, represent the proper dutiable values of the importations in question.

### The Record

In the circumstances of the present case, the record is best understood by summarizing the relevant testimony, starting with the testimony of Morris

---

1. Plaintiff abandoned its claims as to style no. 71 in entry 104213; as to style no. 102; as to style no. 104, except in entry 103137; and as to style no. 5004.

Kantorovich, president of the importer, Spanexico, and also president of the Riviera Sofa Bed Co., both of which were located at 2875 El Cajon Boulevard, San Diego. Mr. Kantorovich testified that Spanexico was a corporation formed in 1969 to import wrought iron and wooden furniture from Mexico. It first purchased this furniture for about three months in 1969 from a Mexican manufacturer, Muebles Coloniales Mexicanos. That firm, however, went out of business in September 1969. Kantorovich thereupon looked for other suppliers in Tijuana and in Mexicali, but could not find any to supply him, though there were a number of backyard operators in Tijuana as well as two larger manufacturers there, namely, Vargas and Manufacturera Commerciale; however, these two companies were already selling to somebody else and could not supply him. Kantorovich, therefore, asked Sergio Gavaldon, a social friend and not a business associate, who had never been in the furniture business if he would set up a plant to produce furniture that was up to the standard needed for the American buying public and thus enable Spanexico to obtain such merchandise from a reliable source. Gavaldon agreed and thereupon Gavaldon, S.A.[2] of Tijuana was formed around September 1969. Mr. Kantorovich testified that he had no financial interest whatsoever in Gavaldon, S.A., did not own any of its stock and was not an officer or director. Although he sometimes went to visit the Gavaldon plant to see how his orders were doing, he did not supervise that company in any way. While Spanexico did not furnish or purchase any machinery for Gavaldon, S.A., it did furnish designs or plans for furniture as well as the glass, cartons, and packing materials for the furniture.[3]

Furniture purchased by plaintiff Spanexico from Gavaldon, S.A. was paid for by check payable to whomever Gavaldon designated; thus, on occasion, Spanexico paid for the furniture by depositing its check for the amount due in an account Gavaldon, S.A. maintained in a San Diego Bank. Money in this account was used to establish credit so that Gavaldon, S.A. could purchase materials it needed from American suppliers. Bank statements from the account were sent to Spanexico's office in San Diego.

Mr. Kantorovich would sometimes purchase supplies for Gavaldon, S.A. for which he was repaid by checks written on this account. He bought such supplies on behalf of Gavaldon, S.A. since American companies were afraid to sell to companies in Mexico for fear they would not get paid.

The checkbooks for Gavaldon, S.A.'s bank account were kept at Spanexico's office in San Diego. At Mr. Gavaldon's request, Mr. Kantorovich asked Mrs. Eileen Krake—who was Spanexico's secretary-treasurer and also secretary to Kantorovich in his capacity as president of Riviera Sofa Bed—to write and sign all checks for Gavaldon, S.A. Spanexico did not have similar arrangements with any other manufacturer and did not charge Gavaldon, S.A. for the services performed by Mrs. Krake.

Additionally, Spanexico advanced to Gavaldon, S.A. without any interest a total of $146,982.20 for the period August 1, 1969 through October 31, 1970, of which only $80,600.00 was repaid as of the latter date. The money was apparently advanced without any guarantee to Spanexico that the money would not be used to manufacture merchandise for sale to others. According to Mr. Kantorovich, Mexican manufacturers require an advance for merchandise to insure performance.[4] Kantorovich further testified that Gavaldon, S.A. needed the advances to meet payrolls and to buy mate-

---

2. S.A. stands for "Sociedad Anonima" which means it is a corporation.

3. Kantorovich testified that on occasion, in order to get cartons from this country into Mexico, which was illegal, he would "smear" Mexican customs officials. (R. 69)

4. Kantorovich, however, could not remember whether he advanced any money to Muebles Coloniales Mexicanos, his earlier supplier.

rials to produce the merchandise, because it did not itself have the necessary resources.

All of Spanexico's advances were not repaid because Gavaldon, S.A. had a fire, could not collect insurance thereon, could not provide Spanexico with the merchandise, and went out of business in December 1970. Eventually Kantorovich negotiated a settlement with Gavaldon with respect to the outstanding balance under which Spanexico received $8,000.00.

Spanexico purchased from Gavaldon, S.A. until December 1970 and did not pay the latter more than the price reflected in the invoices. During the period from April to November 1970, such prices remained the same and were allegedly established by negotiation or by market conditions on competitive items. Spanexico paid inland freight to Gavaldon, S.A. and the merchandise was delivered by Gavaldon, S.A. directly to Spanexico's customers since the latter had no warehousing facilities. However, if a delivered item was defective, the customer looked to Spanexico to replace it.

Sergio Gavaldon, plaintiff's second witness, testified that prior to the formation of Gavaldon, S.A. in 1969, he had never been in the furniture business. His responsibilities as president of Gavaldon, S.A. were to name the people who were going to manage the business, that is, the chief of production, the bookkeeper-accountant, etc. During 1970, he himself had several businesses, such as "money change houses" and restaurants, and he also worked in department stores.

Although not sure, Mr. Gavaldon believed that Gavaldon, S.A.'s prices to Spanexico were arrived at by having Gavaldon's chief of production calculate costs to which was added a markup of approximately 80 percent for general expenses and profit. Plaintiff's exhibit 3 represents the prices at which the furniture was sold to Spanexico in February 1970. While Spanexico tried from time to time to lower these prices, the prices in 1970 did not vary to any significant extent.

Gavaldon, S.A. did not have any customers other than Spanexico, which was its exclusive customer. Nor during 1970 did Gavaldon, S.A. offer to sell its merchandise to any company other than Spanexico. Gavaldon, S.A. was paid sometimes in advance with the balance paid on delivery; however, it was never paid more than the prices shown on the invoices. According to Gavaldon, $146,000.00 was advanced by Spanexico to Gavaldon, S.A. of which some $80,000.00 was paid back and the balance liquidated by an arrangement between the two firms.

Gavaldon, S.A. received all packing materials and glass from Spanexico without charge and accordingly the price to Spanexico was based on the cost of only those materials that Gavaldon, S.A. actually put into the furniture.

Mr. Gavaldon testified that no one connected with plaintiff was a stockholder in Gavaldon, S.A.; that Mrs. Krake never worked as a bookkeeper for Gavaldon, S.A.; that he had problems in establishing credit in the American market and therefore asked Mr. Kantorovich to open up an account for Gavaldon, S.A. in an American bank and to pay its suppliers from that account.

Mr. Gavaldon confirmed that Gavaldon, S.A. ceased operations in December of 1970 due to a fire which occurred in April 1970. The fire started in the painting department, then went to the storage or the warehouse, and to the office, where most of the contents were burned. It was unable to collect the insurance and therefore has brought suit in court against the insurance company.

The third witness called by plaintiff was John Vincent McNally, a supervisory import specialist of the Customs Service at San Ysidro since April 1974 and prior thereto a senior import specialist at that port since 1965. He testified that one of the lines he handled as an import specialist in 1970 consisted of wrought iron furniture. He could not recall all of the importers who were importing this type of merchandise from Mexico in 1970,

though he indicated that there were probably two major and one minor importers, the major ones being Spanexico and Castilian, Incorporated (whose supplier was Herreria Vargas) and the minor one being Frank Real (which purchased from Manufacturera Commerciale).

With regard to the merchandise involved herein, Mr. McNally testified that he appraised it on the basis of "such merchandise" "on a period of time *subsequent* to the expiration of the business of Gavaldon." (R. 176) [Emphasis added.] More particularly, he stated that the last exportation from Gavaldon, S.A. to Spanexico occurred around December 3, 1970 and that on December 6 or 7, 1970, new shipments came in for Spanexico from V.I.P. de Tijuana. He believed this was the same merchandise from a different seller and in these circumstances made his appraisal of the importations here in question on the basis of V.I.P.'s prices to Spanexico for merchandise shipped on and after December 6, 1970. He added that V.I.P. did not export any merchandise between April 1970 and November 1970.

Finally, Mr. McNally conceded that he made two errors in his appraisement. Thus he admitted that style 104 in entry 103137 should have been appraised at $36.00 each and not at $52.50 each, and that style 5001 in entry 106032 should have been appraised at $4.25 and not at $5.75 each.

Defendant called as a witness Mrs. Eileen Krake who testified that she had been employed by Riviera Sofa as Mr. Kantorovich's secretary since 1957, where she did the bookkeeping, handled office details, calls, appointments, etc., and occasionally wrote checks for Riviera Sofa. Simultaneously she held the position of secretary-treasurer for Spanexico in which capacity she supervised all of the purchase orders as they came in, invoiced the customers, and did the necessary bookkeeping work.

Mrs. Krake conceded (i) that her signature appears on a bank signature card with the U. S. National Bank's El Cajon Boulevard branch, where she is listed as the bookkeeper for Gavaldon, S.A. and (ii) that she signed checks for Gavaldon, S.A. on certain specified bank accounts. These bank accounts were with the Banco Comercial Mexicano and the El Cajon Boulevard and San Ysidro branches of the U. S. National Bank. Statements of these accounts were sent to Spanexico's office where she handled them inasmuch as she was "the only one who could reconcile" them. (R. 232) She never signed a check in blank and always received her instructions from Mr. Kantorovich in writing checks on Gavaldon accounts.

### The Law

It is of course basic that the values found by the government are presumptively correct and that the plaintiff has the burden of proving (1) that the appraised values are erroneous and (2) that the plaintiff's claimed values are correct.

With respect to the presumption of correctness of the appraisement, it will be recalled that Mr. McNally, the government's import specialist, testified that his appraised values were based on the selling price of merchandise that was exported at a period of time *subsequent* to the exportation of the merchandise in question. However, export value, as defined by section 402(b) of the Tariff Act of 1930, as amended—which the parties agree is the proper basis of appraisement herein—calls for a price *"at the time of exportation* to the United States of the merchandise undergoing appraisement." [Emphasis added.] Thus, the courts have consistently held that sales or offers of sales *subsequent* to the date of exportation cannot be used, as was done here, to establish the dutiable value of imported products. See e. g., *Augusta Chemical Co. v. United States,* 40 Cust.Ct. 845, 849, R.D. 9165 (1958); *B & W Wholesale Co., Inc. v. United States,* 63 Cust.Ct. 691, 697–8, A.R.D. 262 (1969). It therefore follows that the appraisements herein are erroneous and that the

presumption of correctness attaching to them has been overcome.

In light of this consideration, the remaining question is whether plaintiff Spanexico has proven that its claimed values, i. e., the invoice prices, are the proper export values.

On this aspect, it is to be noted that the record establishes that Spanexico was the manufacturer Gavaldon, S.A.'s exclusive customer and that during 1970 Gavaldon, S.A. did not offer to sell its merchandise to anyone other than Spanexico. Hence, plaintiff Spanexico was a selected purchaser and had the burden, pursuant to section 402(f)(1)(B) of the Tariff Act of 1930, as amended, to establish (1) that the sales to it were in the ordinary course of trade and (2) that its claimed values fairly reflected the market value of the merchandise. We now consider whether plaintiff has met its burden in these two respects.

*Whether plaintiff has proven that the sales of the importations in question were in the ordinary course of trade*

Plaintiff's single argument that the merchandise in question was sold "in the ordinary course of trade" is based upon the assertion in its brief that the record shows that "the Mexican furniture manufacturers located in Tijuana sold to only one selected importer" and that "[t]herefore, sales by Gavaldon, S.A. only to plaintiff herein were 'in the ordinary course of trade.'" Br. p. 18. See also reply Br. pp. 1–2. But even if it be assumed that the record does in fact establish that in Tijuana, Mexico every supplier of merchandise of the same class or kind as that involved here sells for exportation to the United States only to a selected importer, it does not follow that the instant sales were made in the ordinary course of trade merely because they were made to a selected purchaser. As will be discussed later, such a conclusion on plaintiff's part completely ignores section 402(f)(2) of the Tariff Act of 1930, as amended, which defines "ordinary course of trade" as "the conditions and practices which, for a reasona-

ble time prior to the exportation of the merchandise undergoing appraisement, have been normal in the trade under consideration with respect to merchandise of the same class or kind as the merchandise undergoing appraisement."

Nor can support for plaintiff's argument be found in *Chr. Bjelland & Co., Inc. v. United States,* 52 CCPA 38, C.A.D. 855 (1965), upon which plaintiff relies. There, competent evidence was presented to show the conditions and practices under which the exporter did business with its two United States purchasers as well as under which other Norwegian canners did their business. This evidence showed that: (a) the sales between the importer and the exporter constituted a substantial portion of the total industry sales of brisling sardines and kipper snacks and thus represented a substantial manner of doing business; (b) the appellant was the largest single importer of the items in issue; and (c) the trade conditions and provisions under which it had conducted its sales had existed for some time (52 CCPA at 45–6). It was in this context that the appellate court agreed with this court that "there may well be instances wherein there is more than one manner of doing business which would constitute the 'ordinary course of trade'" (*id.* at 45), and held "we do not find that the manner of doing business here to be outside the 'ordinary course of trade' or to require the export value to be based on actual sales or offers thereof by *others* in the industry" (*id.* at 46). [Emphasis in original.] See also *United States v. Lockwood & Freidin,* 61 Cust.Ct. 573, A.R.D. 241, 287 F.Supp. 283 (1968); *Mantell Export Co. v. United States,* 58 Cust.Ct. 662, R.D. 11290 (1967); *United States v. Continental Forwarding Co., Inc., et al.,* 59 CCPA 178, C.A.D. 1063, 463 F.2d 1129 (1972).

In the present case, by contrast, there is no testimony to show that Gavaldon, S.A.'s furniture represented a substantial portion of the *Mexican* industry sales in the kind of merchandise at issue and thus represented a substantial manner of doing business. There is no testimony

that Spanexico was the largest single importer of the kind of merchandise at bar. There is no testimony that Gavaldon, S.A.'s trade conditions and practices had existed for some time. In fact, since Gavaldon, S.A. was in business only between September 1969 and December 1970, its trade conditions and practices cannot be said to have existed for *some time* prior to the exportation of the merchandise at bar. Moreover, the record reveals very little about the conditions and practices under which Gavaldon, S.A. sold its merchandise, and nothing as to whether they even remained the same during the time Gavaldon, S.A. was in business.

Inasmuch as plaintiff has failed to show the applicability of the *Bjelland* decision to this case, it was its burden to show the conditions and practices existing between it and Gavaldon, S.A., as well as those existing in the trade, so that the court could determine whether the instant sales were in the ordinary course of trade. The record, however, reflects very few facts regarding the existing conditions and practices.

Indeed, with regard to the transactions between Gavaldon, S.A. and Spanexico, the record presents merely an outline of a rather unusual relationship. Mr. Kantorovich, just having had his furniture supplier Muebles Coloniales Mexicanos go out of business and being in need of a *reliable* furniture supplier, requested Mr. Gavaldon, a social friend, who had never been in the furniture business before, to set up a furniture factory. As a result, Gavaldon, S. A. was formed in Mexico in September 1969, and the parties began transacting business. Spanexico advanced Gavaldon, S.A. $146,892.20, without any interest and apparently without any guarantee that the money would not be used to manufacture furniture for sale to others.[5] Gavaldon, S.A., in turn, manufactured the furniture and sold it exclusively to Spanexico at prices which remained constant and were allegedly established by negotiation or by market conditions on competitive items, though the record is barren of any evidence showing what merchandise was in the market and at what prices. Presumably the parties entered into some type of an agreement setting forth their mutual rights and obligations. However, it is not in evidence and its terms and conditions remain undisclosed.

In April 1970, Gavaldon, S.A. suffered a fire which destroyed a part of its facilities, thereby affecting its ability to deliver furniture. Nevertheless, Spanexico continued buying from Gavaldon, S.A. until December. As of October 31, 1970, only $80,600.00 of the $146,982.20 advance had been repaid even though, as seen from the invoices attached to the entries herein, from April through October 1970 Spanexico purchased some $118,000.00 worth of furniture against which $66,382.00, the balance of the advance, could have been applied. This balance was subsequently compromised by a $8,000.00 payment.

Additionally, in April 1970, a signature card was filed with a branch of the U. S. National Bank of San Diego identifying Mrs. Krake, Spanexico's secretary-treasurer, as Gavaldon, S.A.'s bookkeeper and authorizing her to draw checks on the Gavaldon, S.A. accounts at that bank. Thereafter, in accordance with Mr. Kantorovich's instructions which were issued pursuant to Mr. Gavaldon's request, she wrote and signed at least 135 checks on those accounts totalling approximately $314,000.00. See defendant's exhibit C.[6] She also wrote checks

---

5. It is to be noted that Spanexico dealt with two other furniture suppliers—Muebles Coloniales Mexicanos in 1969, and V.I.P. de Tijuana subsequent to its dealings with Gavaldon, S.A. Yet, Mr. Kantorovich could not even remember whether Spanexico ever advanced any money to Muebles Coloniales. Further, there is no evidence in the record as to whether or not Spanexico ever advanced any funds to V.I.P.

6. Defendant's exhibit C consists of checks written from April 1970 through October 1970 on the Gavaldon, S.A. accounts at the San Ysidro and El Cajon Boulevard branches of the U. S. National Bank and signed by Mrs. Krake. Each check allegedly shows in the left-hand corner what it was written for.

on a third Gavaldon, S.A. account in the Banco Comercial Mexicano. All the bank statements concerning these three Gavaldon accounts were sent to Spanexico's office because Mrs. Krake was the only one who could reconcile them.

Gavaldon, S.A.'s two accounts at the U. S. National Bank were opened by Spanexico and the funds for the accounts came from Spanexico. And while ostensibly the accounts were opened for the purpose of making payments to Gavaldon, S.A.'s American suppliers who did not want to deal with Mexican companies for fear they would not get paid, only about 10 percent of Gavaldon's funds in this bank were used to pay what appears to be American suppliers. See defendant's exhibit C. At the same time, checks were written to pay off loans, loan interest, and various advances, some of which possibly represented mere transfers to other accounts. *Ibid.* Viewed thusly, it is difficult to understand why a Mexican manufacturer would want its American purchaser to be in a position to know how its funds were spent; why it would want the purchaser's secretary-treasurer to write its checks and reconcile its bank statements; why Mrs. Krake was the only one who could reconcile Gavaldon, S.A.'s bank statements; why Gavaldon, S.A. needed to open an account in the United States in April 1970 to establish its credit when it began business in the previous September; and why Spanexico and Mrs. Krake performed services for Gavaldon, S.A. without any compensation by the latter. These and many more questions remain unanswered. Further, there is no evidence whatever about the conditions and practices existing in the trade.

Against this background, it must be concluded that plaintiff has failed to prove that sales of the instant merchandise were in the ordinary course of trade

since the record is devoid of evidence concerning the conditions and practices which were normal at or prior to the time of exportation. *Henry Picard, Jr. v. United States,* 57 Cust.Ct. 689, R.D. 11242 (1966); *Inter-Maritime Fwdg. Co., Inc. v. United States,* 51 Cust.Ct. 529, A.R.D. 162 (1963).[7]

Particularly pertinent to the question here is *National Carloading Corporation v. United States,* 57 Cust.Ct. 758, A.R.D. 215 (1966). Involved in that case was a situation where the trial court had found that plaintiff had failed to establish that the sales to the importer were in the "ordinary course of trade" because there were no evidentiary facts from which the court could make findings. The Appellate Term agreed, noting, among other things, that the importer had failed to inform the court of the normal trade practices of other importers (57 Cust.Ct. at 763–4). The same reasoning is applicable here.

### Whether plaintiff has proven that its claimed values fairly reflected the market value

"One of the important changes made by the Customs Simplification Act of 1956 is found in the definition of the term 'freely sold or, in the absence of sales, offered for sale' so as to include sales or offers not only to *all* purchasers, as formerly required, but 'in the ordinary course of trade to one or more *selected* purchasers at wholesale at a price which fairly reflects the market value of the merchandise' * * *." Sturm, *op. cit., supra,* p. 76. [Emphasis in original.] Helpful in interpreting this provision is a pamphlet issued by the Bureau of Customs on December 12, 1956, entitled "Valuation—Customs Simplification Act of 1956," which states in part (p. 1):

In the absence of sales or offers to all purchasers at wholesale resort may

---

**7.** "Evidence of the manner in which one exporter conducts his business does not necessarily establish what is normal or usual in the

trade. The practices of others engaged in the same class of trade are relevant." Sturm, *A Manual of Customs Law* (1974) p. 59.

be had to sales confined to one or more selected purchasers at wholesale when it is the usual trade practice to adopt such methods of distribution provided that such sales are *normal arms length transactions.* * * * [8] [Emphasis added.]

■ To similar effect, this court has indicated that if it is ever possible to determine that invoice prices to a selected purchaser fairly reflect the market value without evidence of prices in other kinds of transactions for comparison purposes, that is so only when the relations between buyer and seller are clearly set forth and are such as to warrant an inference that they dealt at arms length. *National Carloading Corporation v. United States,* 57 Cust.Ct. 758, A.R.D. 215 (1966).

With these considerations in mind, plaintiff argues in its brief (p. 17) that—

The evidence herein shows that the transactions herein between the seller and plaintiff were at arms length and between unrelated parties. Thus, although plaintiff was the only selected wholesaler to whom the seller sold its merchandise, this fact also establishes that the prices at which this merchandise was sold, which prices remained constant during the period in question, fairly reflect market value. *J. L. Wood v. United States,* 62 CCPA ——, C.A.D. 1139, 505 F.2d 1400 (1974).

This statement, however, is erroneous both as a factual and legal conclusion. For the evidence does not show that the transactions between the seller Gavaldon, S.A. and the selected purchaser Spanexico were at arms length. Indeed, as previously discussed, only an outline of the transactions between the parties has been presented with more questions

left unanswered than answered. For example, the court cannot understand how the transactions can be considered to be at arms length when there is no explanation whatever of the substantial advance that Spanexico made to Gavaldon, S.A. without any interest, without any guarantee that it would not be used to manufacture merchandise for someone else, and which remained "unpaid" even though Spanexico was paying for the merchandise it received. If it was merely an advance made at the time the merchandise was ordered, the question arises as to why it was not offset against the purchase price paid by Spanexico, particularly since Spanexico received some $118,000.00 worth of furniture from Gavaldon, S.A. during the April through October 1970 period. Nor can the court understand how the transactions can be considered to be at arms length when, without compensation, an officer of Spanexico took an active part in Gavaldon, S.A.'s business by writing most, if not all, of its checks during the relevant period and reconciling Gavaldon's bank statements.

Further, this case is clearly distinguishable from *J. L. Wood v. United States,* 62 CCPA ——, C.A.D. 1139, 505 F.2d 1400 (1974). In *Wood* the court stated that the exporter Carter, Ltd. sold for export to the United States not only to its wholly-owned American subsidiary, Carter, Inc., but also to unrelated original equipment manufacturers [OEM's] at the same basic price and thereupon held that Carter, Ltd.'s invoice prices to Carter, Inc. fairly reflected market value. In the court's words (505 F.2d 1406):

We join the trial court in saying: "What better proof is there of the price fairly reflecting the market value when sales are made to other unre-

---

**8.** This court considered this pamphlet "of very high authority in view of its publication by the Treasury Department, which sponsored the Customs Simplification Act of 1956, the very year it was enacted." *F. B. Vandegrift & Co.,* *Inc. v. United States,* 56 Cust.Ct. 715, 721, R.D. 11169 (1966), *aff'd,* 60 Cust.Ct. 965, A.R.D. 239 (1968), *aff'd,* 56 CCPA 105, C.A.D. 962, 410 F.2d 1259 (1969).

lated United States concerns [OEM's] at the same basic price."

■ In the present case, however, Gavaldon, S.A. sold only to Spanexico. What is more, neither competitive purchasers nor competitive sales have been identified; competitive merchandise has not been described; and competitive prices have not been set forth. Considering (i) that the relationship of the parties has not been fully explained; (ii) that an arms length transaction has not been shown; and (iii) that there is no probative evidence as to sale and purchases by others of such or similar merchandise, there can be no basis for concluding that Gavaldon, S.A.'s invoice prices to Spanexico fairly reflected the market value of the merchandise.

*Conclusion*

From the foregoing, it is evident that plaintiff has failed to prove that its claimed values, i. e., the invoice prices, represent the proper dutiable values of the importations in question. Therefore, the appraised values must be affirmed with the exceptions (1) that the correct dutiable value for style 104 in entry 103137 is $36.00 each; and (2) that the correct dutiable value for style 5001 in entry 106032 is $4.25 each.[9] Judgment will be entered accordingly.

---

**9.** It will be recalled that at trial the government appraising officer conceded that as to these two entries he had erred in appraising the above listed style numbers and that the correct appraised values for such styles are those set out above.